ROBERT P. CLELAND, PETITIONER-DEFENDANT, v. VE-
RONA RADIO, INC., RESPONDENT-PROSECUTOR.

Argued May 4 and 5, 1943—Decided September 9, 1943.

Before Justices PARKER, HEHER and PERSKIE.

For the prosecutor, *McCarter, English & Egner* (*Verling
C. Enteman* and *Winslow B. Ingham, II.,* of counsel).

For the defendant, *Kalisch & Kalisch* (*Isidor Kalisch,* of
counsel).

The opinion of the court was delivered by

HEHER, J. On October 20th, 1930, Cleland sustained severe personal injuries by an accident which arose out of and in the course of his employment with prosecutor as a salesman; and on January 18th, 1932, a judgment was entered in the Workmen's Compensation Bureau awarding him compensation for permanent total disability in conformity with chapter 95 of the laws of 1911, as amended. *Pamph. L., p.* 134; now *R. S.* 34:15-1, *et seq.* There was no appeal from the judgment; and compensation was rendered at the statutory rate for 400 weeks. These payments were completed on May 29th, 1939; and on May 17, 1940, Cleland presented a petition to the Compensation Bureau praying for a continuance of compensation under *section* 34:15–12b, as amended by chapter 97 of the Laws of 1942. *Pamph. L., p.* 352. The deputy commissioner made an award in his favor; and the Essex Common Pleas affirmed the judgment. Mr. Justice Parker denied the employer's motion for a writ of *certiorari;* and the application is now renewed here. It is listed as No. 222 on the calendar of the current term.

In April, 1941, the employer interposed a petition alleging a decrease of the permanent disability since the entry of the original judgment in the Bureau, and praying "a further hearing to establish that fact." An answer was filed, and there the matter rested until July, 1942, when an amended petition was presented averring full payment of the award for permanent total incapacity and a diminishment of the permanent disability since the award was made, and praying "a review of the award" on that ground and for judgment that Cleland "repay" to the employer "all moneys paid" by the latter "in excess of the present amount of the disability." The deputy commissioner, after hearing, found that, while there had been some improvement in Cleland's physical condition, he was still laboring under a disability total in character and permanent in quality. The petition was dismissed. *Certiorari* was allowed by Mr. Justice Parker. In view of the pendency in this court of the application for a *certiorari* in No. 222, the writ was granted notwithstanding that an appeal had not been taken to the Court of Common Pleas. The case is No. 243 on the calendar.

This latter proceeding was instituted under *R. S.* 34:15–27, providing that "An award may be reviewed at any time on the ground that the disability has diminished;" and the contention is that Cleland's incapacity has diminished since the making of the award, and "is now less than 100 per cent. of total," and the judgment of dismissal should be reversed "to the end that a determination of facts and rule for judgment be entered in accordance with the evidence."

Certainly, prosecutor would not be entitled to an accounting for the compensation payments made, if there be a finding of a reduction of the disability to a degree less than total, for the statute confers no such jurisdiction upon the Bureau. This is a function wholly statutory in origin; and the Bureau's authority is confined to that granted in express terms and such as is reasonably to be implied.

Presumably, the primary purpose is to have it established that Cleland's permanent incapacity is now less than total, and thus to avoid liability for continuing benefits under *section* 34:15–12b, *supra*. But *section* 34:15–27, *supra,* seems to have been designed to confer a continuing jurisdiction to regulate the basic compensation payments in consonance with after-occurring changes of disability. On the other hand, *section* 34:15–12b provides for an "extension of compensation payments beyond 400 weeks." Such "extension" of compensation, in the statutory intendment, is obtainable only in the event that certain conditions are met, *i. e.,* that the employee "shall have submitted to such physical or educational rehabilitation as may have been ordered by the rehabilitation commission, and can show that because of such disability it is impossible for him to obtain wages or earnings equal to those earned at the time of the accident, in which case further weekly payments shall be made during the period of such disability, the amount thereof to be the previous weekly compensation payment diminished by that portion thereof that the wage, or earnings, he is then able to earn, bears to the wages received at the time of the accident." This language plainly connotes an inquiry into the extent of the claimant's incapacity. The test is whether he has submitted to such "physical or educational rehabilitation" as may have been

directed by the Commission, and, because of "such disability," it is "impossible for him to obtain wages or earnings equal to those earned at the time of the accident." If this inquiry be resolved in the claimant's favor, what he is "then able to earn" is taken into account in fixing the amount of the "further weekly payments" to be made "during the period of such disability." Thus, a broad revisory power is vested in the Bureau. The extended payments are made subject "to such periodic reconsiderations and extensions as the case may require." Continuing permanent total disability is a *sine qua non* to such relief; and, by the same token, its nonexistence is a defense to a petition therefor. It is also provided in this section that such "extension" of compensation benefits shall apply "only to disability total in character and permanent in quality." This has reference not alone to the nature of the basic award, but also to a continuing status that is fundamental. And the provision of extended payments is significant of the legislative sense of the term "permanent total disability."

The original judgment is not *res judicata* of the issues properly cognizable under *section* 34:15–12b. It is subject to the continuing revisory jurisdiction conferred by this section as well as *section* 34:15–27. *Vide Tucker* v. *Frank J. Beltramo, Inc.,* 117 *N. J. L.* 72; *affirmed,* 118 *Id.* 301.

We are thus brought to a consideration of the companion case No. 222.

Conceding that Cleland has satisfied the requirement of submission to "physical or educational rehabilitation," it is maintained that (1) he "has rehabilitated himself to a point where he is not entitled to additional benefits" under *section* 34:15–12b; (2) he "has submitted no proof as to what his actual wages and earnings have been since the accident; and (3) there has been "no proper proof as to the petitioner's inability to obtain wages or earnings equal to those earned at the time of the accident."

In support of the first reason, it is briefly argued that the claimant admitted to one of prosecutor's medical experts that he "feels he is about 60% to 75% disabled, * * * and can do some work, probably about 25% to 40%, that is work-

ing around," although "he has to use crutches going about and around;" and that, in this witness' opinion, the "farm presented his own school for rehabilitation," and "he was being rehabilitated, earning something at the same time—the finest rehabilitation we can look forward to."

The claimant's estimate of the *quantum* of his incapacity, reduced by the use of artificial appliances, is manifestly not conclusive of his rights under the statute. And, as respects the expert's opinion, the question is whether he has been guided by the statutory standard and has fairly assessed the evidence. In disposing of the contention, we shall consider the proofs adduced and the arguments made in No. 243.

In October, 1930, the claimant sustained severe spinal and other bodily injuries; and he is still grievously afflicted. The trauma produced "multiple concussional hemorrhages of the spine." There were "clusters" of hemorrhages "in the central nervous system, brain and spinal cord." Vertebrae were cracked. His legs were paralyzed; and there were a serious involvement of the bladder and bowels and other disorders emanating from injuries to the nervous system. Hospitalization was required until 1932; and he has since been obliged to use crutches. Concededly, he was then totally incapacitated; and prosecutor seems to acknowledge that this condition continued throughout the basic compensation period of 400 weeks. And a review of the evidence satisfies us that the claimant is still totally and permanently disabled within the purview of the statute.

The compensable disability is both functional and organic. Dr. Kummel testified that the claimant, who is now forty years of age, "is worse off than the man who has both legs off." And undoubtedly there are complications that operate against alleviation. One of prosecutor's medical experts, Dr. Beling, admitted that a recent examination disclosed that the claimant's "physical" and "objective findings" were practically the same as when he examined him shortly after the accident, "except that they were diminished in degree." There are still paralysis and some atrophy of both legs. The right leg is now useless, and there is but partial use of the left leg. The right leg "hangs loose without the crutches."

When claimant "stands or walks without any support there is a marked tilt of the pelvis almost to a right angle." There is a "marked distortion of the spine." When he stands unaided, it "becomes twisted, turns around, not only that it bends all the way down but it also has a marked twist as well as flexion." He is required to use the left side "more actively as the part to propel him." There are still many areas of anesthesia on the right side and numbness in the left leg, *i. e.*, lack of sensation due to hemorrhages "pressing on the nerves." He suffers tremors of both hands and of the head and eyelids, indicating a brain injury and involvement of the sensory tract. He cannot walk without crutches. If, by the use of crutches, he remains on his feet for more than an hour, he becomes nauseous and dizzy and has severe pains of the back, described as "a hot, burning, traveling sensation." Pain that is more or less constant is aggravated by work. He is subject to severe headaches lasting from one to two weeks, with relief intervals running from one week to ten days. From time to time, as often as twice a month, he suffers spells of unconsciousness without forewarning. The period of unconsciousness varies from five minutes to an hour and a half; and he is thereafter incapacitated from two to three days. When he leans downward, he has dizziness, nausea and vomiting. There is atrophy of the back muscles. He is unable to assume and maintain "any kind of upright posture." Dr. Kummel said: "If you take away the props from under him he has no function, no matter how much function remains above, I mean as a useful unit." And he still has bladder and rectal derangements. His wife, a trained nurse, is obliged to administer an enema daily and colonic irrigations twice a week, due to paralysis of the intestinal tract. It is conceded that there are constant irritating factors involving the central nervous system.

There is no suggestion of malingering. The claimant is freely absolved of the suspicion of exaggeration of his injuries. Indeed, his tendency is in the other direction. He has shown extraordinary grit and determination in facing his physical handicaps, and prides himself on his achievements, real or fancied, in overcoming them. Dr. Dowd said that the idea

of total disability was repugnant to him, and "he wishes to regard himself as competent to engage in a certain number of activities."

In 1933, the claimant and his wife established a chicken farm in Maryland; and he has since participated in the management of the enterprise, largely in a supervisory capacity. He feeds the chickens and cleans eggs. He is able, with the use of crutches, to carry a pail of feed weighing 18 to 20 pounds. But it is clear that his physical labor has been practically nil. His wife and a hired man have done the work in major part; and it is conceded by one of prosecutor's experts, Dr. Olcott, that, without the care of his wife, he would be of no assistance whatever in the operation of the farm. He would not then be able to "engage in activity." The gross annual income of the farm is approximately $2,200, and the net income about $425, without making allowance for living expenses.

Prosecutor's experts, Dr. Olcott and Dr. Beling, estimate claimant's permanent disability at from 60% to 75% of total, while Dr. Dowd and Dr. Kummel hold the opinion that he is totally disabled in the sense that he is disqualified "from competitive industry and from remunerative and competitive employment"—in other words, that he is unemployable. In Dr. Dowd's view, he has physiologic function to the extent of 50%, but he is unemployable because of a lack of physical capacity for work, arising from his "inability to maintain an upright position, to walk normally, to have proper control of his bladder and rectum," his "sensory and motor difficulties," his liability to unconsciousness without premonition, which "add to the menace," and general bodily weakness. Prosecutor's experts, on the other hand, have plainly given undue emphasis to physiologic function and claimant's very limited participation in the operation of the chicken farm. Dr. Olcott indicated that with him the ability to do "some work" was the determinative. The factor deemed conclusive was claimant's ability to run the work on his chicken farm." He admitted that "there would always be a danger because of the periods of unconsciousness without warning," although he said "there can be protection against that."

The claimant's injuries and their consequences must be viewed as a whole. He is to all intents and purposes unemployable. Apart from the other disqualifying factors, he is not capable of the continuous service requisite for the performance of the tasks of any remunerative employment for which he would be fitted were it not for his injuries. His physical infirmities and deficiencies consequent upon the industrial accident render his labor unsalable to any market accessible to him. *Vide Everhart* v. *Newark Cleaning and Dyeing Co.,* 119 *N. J. L.* 108. It is not necessary that he be absolutely disabled or totally paralyzed. He is not obliged to give service that must needs be attended with severe pain and suffering, or such as would endanger his health. Compare *Richardson* v. *Essex National Trunk Co.,* 119 *Id.* 47; *Simpson* v. *New Jersey Stone and Tile Co.,* 93 *Id.* 250. It is fundamental in *section* 34:15–12b, *supra,* that an employee may be totally and permanently disabled and yet have some degree of earning power. The term "disability" is not confined to such loss of physical function as effects an immediate impairment of earning power, but embraces also "the loss ensuing from personal injury which detracts from the former efficiency of the workman's body or its members in the ordinary pursuits of life." *Everhart* v. *Newark Cleaning and Dyeing Co., supra.*

After his submission to physical or educational rehabilitation the claimant's earnings, unlike those of the basic compensation period of 400 weeks, serve to reduce the employer's liability for further compensation in accordance with the statutory precept. The question then arises, Is the disability less than total? The statute is lacking in a definitive formula that will automatically resolve every case respecting the degree of incapacity, measured by faculty for employment and *quantum* of wages or earnings, that is less than total. It is therefore to be presumed that, apart from the loss of members which under section 34:15–12b is deemed permanent total disability as a matter of law, the legislative mind had in contemplation the generally accepted rule that ability for "light" or intermittent work or labor is not inconsistent with total incapacity. *Vide* 67 *A. L. R.* 785, *et seq.; Cardiff*

*Corp.* v. *Hall* (1911), 1 *K. B.* 1009. In this class of cases, whether claimant is totally disabled for work is a mixed question of law and fact; and its determination calls for the exercise of sound judgment and discretion, guided by the statutory principle, in appraising the circumstances of the particular case.

The second and third reasons are equally groundless. There was full and ample proof as to the *quantum* of claimant's earnings since the accident; and the evidence establishes his inability "to obtain wages or earnings equal to those earned at the time of the accident." The argument is that he "has chosen to select a form of *quasi*-manual labor which may pay him less than what he might earn or obtain in some mental supervisory field," and that "this, without proof that he has attempted other more lucrative vocations without success, is not enough." It suffices to say as to this that the medical experts seem to be in agreement that the claimant, in the course taken, pursued what was the best form of rehabilitation open to him. Indeed, as hereinbefore noted, this seems to be conceded in the grounds for relief advanced by prosecutor. Moreover, it is clear that he could not have earned more in any other field of endeavor available to him.

And there was no harmful error in overruling a question propounded by prosecutor to its witness, Dr. Irvin, a member of the staff of the Rehabilitation Commission, designed to elicit the witness' opinion respecting the extent of claimant's disability as certified in a report made by him and four associate physicians to that commission. The question was overruled as calling for an expert opinion in violation of rule 17 of the Workmen's Compensation Bureau (promulgated pursuant to *R. S.* 1937, 34:15–64), providing that "No doctor, referee or other employee" of the Bureau shall testify "in any formal proceedings in the" Bureau. It is said that this rule has no application since the witness was an employee of the Rehabilitation Commission and not of the Bureau.

There is no occasion to pass upon the propriety of the ruling. The witness finally said that he had no independent recollection sufficient to sustain an opinion, and he was therefore compelled to have recourse to the "joint findings." This

also applies to the offer of like evidence from the witness' medical associates. It was stipulated that they "would testify in practically the same manner as did Dr. Irvin."

It results that the judgment of dismissal in No. 243 is affirmed, and the motion for a *certiorari* in No. 222 is denied, with costs in both cases.