15 N.J. Super. 565 (1951)
83 A.2d 656
OTTO KALSON, PETITIONER-APPELLANT,
v.
STAR ELECTRIC MOTOR COMPANY, RESPONDENT-APPELLEE.
Superior Court of New Jersey, Essex County Court Law Division.
Decided October 5, 1951.
*566 Mr. Joseph A. Fuerstman, attorney for the petitioner-appellant.
Mr. Roger F. Lancaster, attorney for the respondent-appellee.
*567 FRANCIS, J.C.C.
Appellant was allowed compensation for 50 per cent of total permanent disability by the Workmen's Compensation Division. He has appealed on the ground that the award should have been for total permanent disability.
The parties agree that Kalson suffered a compensable injury to his left knee on June 6, 1945, and that on June 30, 1947, he was granted compensation at $20 per week for 53 1/7 weeks temporary disability, 75 per cent loss of the injured leg, and 5 per cent of total permanent disability on account of a neurosis.
The present petition was filed on July 12, 1950, and by it Kalson seeks further compensation on a claim that his disability has increased since the previous award.
Petitioner, who was 71 years of age at the time of the hearing, testified that the condition of his knee is now much worse than it was at the time of the original proceeding and that it is getting worse all the time. It does not bother him if he sits or stands still, but any time he moves it he has extreme pain; if he steps on anything uneven or twists it in any way he gets "terrible, extreme pain" in the knee and leg. He wakes up a number of times at night with the pain. He was able to do some odd jobs, such as painting and carpentry, around the house in 1947 but now is unable to do so. Such extreme pain was suffered on undertaking to use a hammer or saw or paint brush that he had to give it up. Even when he undertakes to get up from a sitting position and every time he moves his foot he has severe pain.
The record discloses that with the consent of the parties, the deputy director selected a disinterested physician to examine Kalson and report his findings to him. This physician, Dr. Max Singer, was called as an independent medical witness. His examination took place on February 12, 1951, less than two months before the hearing. At this time petitioner was walking with a partially bent left knee and supported by a crutch and a cane. The doctor noticed that in standing unaided full weight was not put on the left foot. The knee *568 showed a two and one-half-inch operative scar; the joint was markedly enlarged due to bony thickening of the articular surfaces and the presence of fluid therein. The joint was held in 30-degree flexion and further extension was painful and resisted. In the doctor's opinion total loss of the leg was present and "in addition there is a serious question of how the painful swelling of the left knee affects his capacity to carry on employment of any kind or work of any kind, unless he has a position which does not involve the use of this leg." Also the doctor thought "he would not pass a physical examination for employment unless the person to whom he is applying for employment has a charitable inclination."
On further questioning Dr. Singer said that if he were doing some kind of work in a sitting position but during which he had to get up from time to time he would suffer pain, "but while in the sitting position and resting his left leg and knee, I think he could work with his hands and mind, but if it required any ambulation, I don't think he could go around at all, even with his crutch and cane." And then:
"Q. In other words doctor, any kind of work requiring movement would not be practical from the standpoint of industrial employment?
A. That's right, requiring ambulation."
Dr. Singer felt that an operation should be performed on the knee to eliminate the synovial membrane and long spurs which are the principal factors in producing the pain. If the condition remained the same after the medical treatment there would exist total loss of the leg and "additional total disability due to his loss of proper walking." The disability is placed in terms of total "because of the fact that he is unable to carry on the function of ambulation." However, petitioner would not consent to an operation, apparently because of his unfavorable experience with the earlier operation to which he did submit.
Respondent called Dr. Baxter L. Clement who had more actual experience with the injury than any of the other *569 medical witnesses. He examined and treated Kalson for a considerable period of time following the accident on June 6, 1945.
Dr. Clement's language in discussing the case is most expressive:
"* * * This is an unusual case. Dr. ____ operated on this man and the cartilage was removed. Following the surgery he had a rather terrific reaction and that's when I came into the picture. * * * Over the period of years there has been a marked progression of the destruction of that joint. X-rays taken by me in September of 1950 revealed almost complete obliteration of the joint of the femur and tibia  practically disappeared. It is rather unfortunate that the doctor didn't know that this man was that type of arthritic or he probably never would have operated on him to begin with. I noticed here on the stand something that I never noticed before and that has to do with his hands. I think in all probability he has two types of arthritis. I think he has hypertrophic osteoarthritis as Dr. Singer stated, but I never saw osteoarthritis destroy a joint the way it has been destroyed here, so there must be a rheumatoid arthritic condition too  a general rheumatoid arthritic condition. It is just one of those unfortunate conditions."
Dr. Clement's last examination of the knee was on September 19, 1950, and the condition was worse than it was following his original treatment and discharge, the increase in disability being due to "the destruction and instability of the joint that has been progressive in nature."
While the doctor estimated the disability on direct examination at 75 per cent loss of the leg, on cross-examination on being asked whether he knew of any type of work petitioner could do, he said he had heard Dr. Singer's testimony and he was in agreement with it. At first he suggested that Kalson could operate an elevator, but when it was indicated that such an operator would have to get up from his sitting position when persons got on or off, he conceded such work was impossible unless the sitting position remained uninterrupted. Then he admitted that the disability went beyond the leg and said that if petitioner "could go to the Otis Elevator people and they were charitably inclined, there are probably any number of things they could give him to do and that he *570 could do well." But if he had to compete for employment on the basis of a pre-employment examination, he couldn't do it.
Petitioner called one other medical witness, an orthopedic specialist, Dr. William B. Ein. This doctor examined Kalson on numerous occasions in 1945 and 1946 and more recently on June 13, 1950, and "on numerous occasions" was "in conference with the Court." His last examination showed substantially the same condition as described by Drs. Singer and Clement and he found through X-ray examination that the osteoarthritic condition had advanced considerably over what it was when his last X-rays were taken on October 13, 1945. Also this last examination revealed atrophy of the leg above and below the knee and that all motions of the hip cause pain referred to the knee. In March, 1947, his estimate of disability was 75 per cent loss of the leg. Now the impairment is 100 per cent and the petitioner is not industrially employable "because he is unable to get around without the use of a crutch or cane." However, if there were a job available where he would work using his hands and sitting down, such work could be done.
At the close of the hearing the deputy director stated that on the basis of the testimony "together with the various conferences we have had in chambers in connection with the present physical condition of petitioner * * *" he found that Kalson was not totally disabled due to the accident. He expressed the view also that Kalson was employable but not able to take every kind of work. And he found also that a condition existed which antedated the accident and which was "disabling to a certain extent." Therefore he awarded compensation for 50 per cent of total permanent disability subject to credit for the amount already paid under the previous award.
In the consideration of this appeal certain preliminary observations seem necessary. As indicated, the deputy director seems to have made his determination in part on the basis of various conferences held in chambers. There is no doubt *571 that these conferences were held in the utmost good faith, with the consent of all parties and with the benign motive of working out some solution of the controversy. However, the disclosures and the discussions at those conferences were not made part of the record, nor, with the exception of a colloquy about an offer of operation by respondent and a refusal thereof by petitioner, is there any statement by the deputy director as to the nature of the conferences. Therefore, while the County Court gives due consideration to the opportunity of the deputy director to see and hear the various witnesses and to judge of their credibility, it is impossible to attach any weight whatever to the possibility or even probability that disclosures at the conferences influenced his judgment. The cause must be determined solely on the record presented here. Cf. Callen v. Gill, 7 N.J. 312 (1951).
With respect to the finding that petitioner had a preexisting "condition which was disabling to a certain extent" it is noted that the certain extent is not stated in terms of percentage of disability. Nor does there appear to be in the record any basis for an admeasurement of such preexisting disability. The record fails to disclose that the petitioner was not a regular and steady worker before his 1945 accident. There is no showing that he was suffering from any actual disability prior to his injury. While it may be that he had an underlying condition of osteo or rheumatoid arthritis, the fact that the accident or the knee operation caused it to flare up and produce greater disability than would normally follow does not relieve the employer of the full consequences of the employment-produced mishap. Sanderson v. Crucible Steel Corp., 3 N.J. 209 (1949); Marshall v. C.F. Mueller, 135 N.J.L. 75 (Sup. Ct. 1946); Pugh v. Winslow Construction Co., 131 N.J.L. 23, (Sup. Ct. 1943); Hawthorne v. Van Keuren & Son, 127 N.J.L. 501 (Sup. Ct. 1941).
Under the circumstances the adequacy of the award of 50 per cent of total permanent disability must be appraised on the basis of the testimony, lay and medical, as to the present extent of Kalson's disability.
*572 No one disputes that at the present time petitioner is not employable in any capacity which would require the use of his legs or which would involve any movement of his left foot or leg. It is suggested generally that he could do some undefined kind of work with his hands if a charitably inclined employer could be found to employ him. It would be necessary to find such an employer because on a competitive basis, or if a pre-employment physical examination was required, he could not qualify. The only concrete suggestion as to what he could do, namely, operate an elevator, was withdrawn when it was pointed out that even an elevator operator would have to move up from and down to the sitting position. Furthermore, the evidence shows that he gets about with a crutch and a cane. Aside from the fact that such impediments would make it extremely difficult to get to and from work and to move about in an employer's place of business to the particular location of his work, it must be obvious also that they and the appearance of his left leg held in partial flexion would interfere with the saleability of whatever labors he is capable of offering an employer.
The case seems difficult to evaluate in terms of disability because so many of the statements are in terms of total loss of the leg and because two of the three orthopedic medical witnesses indicate rather strongly that an operation would remove the cause of the severe pain which basically is what makes so limited the field of work in which petitioner can engage. However, a workman is not required to submit to this type operation. Simpson v. N.J. Stone & Tile Co., 93 N.J.L. 250 (E. & A. 1919); McNally v. Hudson & Manhattan R.R. Co., 87 N.J.L. 445 (Sup. Ct. 1915), affirmed 88 N.J.L. 725 (E. & A. 1916); Bush v. Rudolph, 14 N.J. Misc. 869 (N.J. Dept of Labor 1936); Enright v. Essex Ice & Cold Storage Co., 6 N.J. Misc. 884 (N.J. Dept. of Labor 1928).
Another factor which makes difficult the task of evaluating the physical impairment is that neither party asked any of the medical witnesses the precise question as to the percentage *573 of total disability from which petitioner is suffering. It is a rare record, indeed, which does not contain this question. Be this as it may, no specific language has ever been prescribed as the sole manner in which the fact of total disability may be established.
A workman does not have to be bedridden to be totally and permanently disabled (Jersey City Printing Co. v. Klochansky, 8 N.J. Super. 186 (App. Div. 1950)); he need not be absolutely disabled or totally paralyzed (Cleland v. Verona Radio Co., 130 N.J.L. 588 (Sup. Ct. 1943)) or completely unable to get about (Hayes v. First Baptist Church of Bloomfield, 18 N.J. Misc. 139 (N.J. Dept. of Labor 1940)). Nor is ability for light or intermittent or sedentary work inconsistent with total disability. Jersey City Printing Co. v. Klochansky, supra; Clark v. American Can Co., 4 N.J. 527, 534 (1950). And the fact that only one member is involved does not prevent such a finding. Simpson v. New Jersey Stone & Tile Co., supra; Coates v. Warren Hotel, 18 N.J. Misc. 363 (Com. Pl. Ct. 1940).
Compensable disability under the act is the loss ensuing from personal injury which detracts from the former efficiency of the workman's body or its members in the ordinary pursuits of life in relation to the field of service to which he is suited. Everhart v. Newark Cleaning & Dyeing Co., 120 N.J.L. 474 (Sup. Ct. 1938).
In Jersey City Printing Co. v. Klochansky, 9 N.J. Super. 361 (Cty. Ct. 1949), affirmed 8 N.J. Super. 186 (App. Div. 1950), in the light of all the circumstances of the case, proof that the workman was seen on two occasions standing on a ladder hanging wallpaper in his home, on another occasion carrying two medium sized ash cans from the sidewalk into the house, on another day sweeping the sidewalk, and making two trips to the corner with a two-wheeled cart to pick up wood which he carted to the back yard, on two other days cutting small pieces of board with a hatchet, carrying the pieces to a wood box and piling them there, did not require *574 a determination that he was no longer totally and permanently disabled.
In Cleland v. Verona Radio, Inc., 130 N.J.L. 588 (Sup. Ct. 1943), the workman had been awarded compensation for total and permanent incapacity. Subsequently the employer applied under R.S. 34:15-37 for a review of the award on the ground that the disability had diminished.
It appeared that Cleland had suffered a severe spinal and other bodily injuries in October, 1930. In July, 1942, following an order for the continuance of compensation payments under R.S. 34:15-12b, at a hearing on the application for review, the employer showed that in 1933 Cleland established a chicken farm in Maryland and since that time had participated in its management. He fed the chickens and cleaned eggs. With the use of crutches he was able to carry a pail of feed weighing 18 to 20 pounds. However, his wife and a hired man did the major part of the work and one of the employer's medical witnesses conceded that without the care of his wife he would be of no assistance whatever in the operation of the farm. Reduction of the award was denied and the action of the deputy director was sustained by the Supreme Court. In the opinion Justice Heher said:
"The claimant's injuries and their consequences must be viewed as a whole. He is to all intents and purposes unemployable. Apart from the other disqualifying factors, he is not capable of the continuous service requisite for the performance of the tasks of any remunerative employment for which he would be fitted were it not for his injuries. His physical infirmities and deficiencies consequent upon the industrial accident render his labor unsalable to any market accessible to him. Vide Everhart v. Newark Cleaning & Dyeing Co., 119 N.J.L. 108. It is not necessary that he be absolutely disabled or totally paralyzed. He is not obliged to give service that must needs be attended with severe pain and suffering or such as would endanger his health. Compare Richardson v. Essex National Trunk Co., 119 Id. 47; Simpson v. New Jersey Stone & Tile Co., 93 Id. 250. It is fundamental in section 34:15-12b, supra, that an employee may be totally and permanently disabled and yet have some degree of earning power. The term `disability' is not confined to such loss of physical function as effects an immediate impairment of earning power, but embraces also `the loss ensuing from personal injury *575 which detracts from the former efficiency of the workman's body or its members in the ordinary pursuits of life.' Everhart v. Newark Cleaning & Dyeing Co., supra.

* * * * * * * *
* * * The statute is lacking in a definitive formula that will automatically resolve every case respecting the degree of incapacity, measured by faculty for employment and quantum of wages of earnings, that is less than total. It is therefore to be presumed that apart from the loss of members which under section 34:15-12b is deemed permanent total disability as a matter of law, the legislative mind had in contemplation the generally accepted rule that ability for `light' or intermittent work or labor is not inconsistent with total incapacity."
Where the basic injury was a badly fractured arm, the Court of Errors and Appeals sustained a total disability judgment. In Simpson v. New Jersey Stone & Tile Co., 93 N.J.L. 250 (E. & A. 1919), the following statement from the opinion of the Supreme Court was approved:
"The original injury was a very bad fracture of the arm, which was compound, and became infected and discharged pus for a long period. Amputation was seriously considered, but the arm was saved. There was, however, a poor recovery, and the patient had several abscesses, and at the time of the hearing was suffering, as the court found, with a severe neuritis caused, perhaps, by minor nerves being involved with the callous of the fracture, which, in the opinion of his physician, made him totally unfit for work, and there was evidence to support the finding that this condition would continue indefinitely unless the arm were amputated.
Prosecutor's claim is that the award cannot exceed that authorized for the loss of an arm, but to this we do not agree. Cases are readily conceivable in which total and permanent disability exists without the loss of or injury to any specific member. If the physical conditions in the present case as the court found them to exist at the time of the hearing created a total disability which was permanent unless the arm were amputated (and we think the evidence justified a finding of such a condition), the case of Feldman v. Braunstein, 87 N.J.L. 20, controls. Petitioner is not required to undergo a serious operation, such as amputation of the arm at the shoulder. The court, therefore, properly dealt with the condition as actually existent."
Coates v. Warren Hotel, 18 N.J. Misc. 363 (Com. Pl. 1940), is a fairly comparable case. There the employee suffered a fracture of the neck of the right femur. Bony *576 union was not obtained at the site of the fracture and partial absorption of the head of the femur appeared. She suffered loss of motion of the leg joints, atrophy and loss of muscle tone, shortening of the leg one and three-quarter inches, and complete loss of function of the leg, so that it was necessary to use crutches to get about.
The proof showed also complaints of loss of weight, inability to sleep, pain in the leg at all times, especially at night, inability to go up and down stairs, nervousness and inability to do the ordinary duties of a housekeeper.
An award of total permanent disability was sustained.
Viewed against the background of these cases, the petitioner's disability must be deemed total and permanent. To all intents and purposes he is unemployable. He can hobble with a cane and a crutch to some unnamed and undescribed kind of work, suffering extreme pain from any movement of his injured knee. He must sit down to this undescribed task and work only with his hands, and his injured leg must be kept completely immobile because of this extreme pain on movement. He could not pass a pre-employment physical examination to obtain this undescribed work. He could not compete in the labor market for the employment. Only an employer interested in doing an act of charity would employ him.
As already indicated, the appeal must be dealt with on the record made below. That record makes necessary a determination that Kalson is now totally and permanently disabled. If this disability decreases respondent has its remedy under R.S. 34:15-27.
Accordingly the determination below is reversed and judgment will be entered for 400 weeks compensation, representing total permanent disability at the agreed rate of $20 per week. Respondent, of course, shall be given credit for compensation already paid. Such a judgment may be presented.