42 N.J. Super. 341 (1956)
126 A.2d 378
AURELIO RODRIGUEZ, PETITIONER-APPELLANT,
v.
MICHAEL A. SCATUORCHIO, INC., RESPONDENT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued October 15, 1956.
Decided October 30, 1956.
*343 Before Judges GOLDMANN, FREUND and CONFORD.
Mr. Louis C. Jacobson argued the cause for appellant (Mr. Herbert Klosk, attorney).
Mr. William T. McElroy argued the cause for respondent (Messrs. Shaw, Pindar, McElroy and Connell, attorneys).
*344 The opinion of the court was delivered by GOLDMANN, S.J.A.D.
This is a workmen's compensation appeal from a County Court judgment modifying an award of total and permanent disability granted in the Workmen's Compensation Division.
Petitioner was employed as a garbage and refuse collector. On May 9, 1953, while emptying a can of garbage into the back of one of respondent's trucks equipped with a power-driven rotator for grinding up the garbage and packing it in the truck, petitioner slipped, his left hand was caught in the grinding mechanism and his arm pulled in up to the left shoulder, so that it was practically severed. He was removed to a hospital and the amputation completed surgically about four to six inches below the shoulder joint. Respondent has from the start recognized that there was a compensable accident in the statutory sense. Prior to the compensation hearing it had paid petitioner $30 a week for 31 weeks for temporary disability, and at the time of trial was paying him $30 a week on the basis of 100% loss of the use of the left arm, in accordance with N.J.S.A. 34:15-12(p). In addition, it had supplied him with an artificial arm.
Rodriguez filed a petition seeking compensation over and above the offer previously made and partially paid by respondent. The sole question presented in the Workmen's Compensation Division and in the County Court was whether he was entitled to compensation beyond that provided for by N.J.S.A. 34:15-12(p). The deputy director made an award of 100% of total permanent disability. Respondent having appealed, the County Court, after a trial de novo on the record and argument, reduced the award to 100% loss of the left arm and 12% of total permanent disability for other orthopedic and neurological injuries stemming from the accident. Pursuant to R.S. 34:15-15 the court directed respondent immediately to rectify the prosthesis theretofore furnished petitioner and which had broken, and that he be given instructions by a Spanish-speaking instructor in its proficient use. The County Court, incidentally, held that petitioner had failed to establish that a hernia of which *345 he complained was causally related to the accident, and that he had failed to give the required statutory notice thereof. N.J.S.A. 34:15-12(x).
The notice of appeal from the County Court judgment indicates that petitioner not only appeals from the reduction in the award, but from the counsel fees allowed for services in the Workmen's Compensation Division and in the County Court. No separate point is made in petitioner's brief that the counsel fees awarded were inadequate in the light of the County Court's ultimate finding as to disability. It is therefore to be assumed that the contention with respect to this issue is that to the extent counsel is successful in establishing here that petitioner's disability exceeds the bona fide offer made by respondent, or exceeds that found to exist by the County Court, he is under N.J.S.A. 34:15-64 to be relatively compensated for his services.
On this appeal petitioner seeks to reinstate the judgment originally entered in the Division. Both the deputy director and the County Court judge recognized that in addition to the loss of his left arm Rodriguez suffered orthopedic and neurological disabilities as a result of the accident. They differed, however, in the extent of the disability allowed. As has so often been stated, we review the judgment of the County Court, but may in the interests of justice make independent findings of fact.
To ascertain whether Rodriguez sustained permanent and total disability requires us to determine, first, what his condition as a working unit was just prior to the accident, and next, what effect the accident had on him as a working unit.
Petitioner was 43 at the time of the accident, and 45 at the time of the Division hearing. He is a Puerto Rican, does not speak or understand English (he testified through a Spanish interpreter), and is a man of limited intelligence, having left school in the third grade at the age of 15. In Puerto Rico he worked in a sugar cane mill for seven years as a blacksmith's helper, then as a carpenter's helper and, finally, as a street laborer. He came to the United States *346 in 1948 as a migrant farm worker, being employed on a farm near Buffalo for a year and then in California where he picked oranges. Thereafter he came to New York and for three years cleaned, swept and painted ships. He next was employed by a dinnerware manufacturer as a polisher. Following this he went to work for respondent as a garbage collector, working steadily without loss of time for six months preceding the accident.
Rodriguez enjoyed a normal life with his wife and four children. He was socially well adjusted, had friends who liked his company, and went to movies and dances. He was, of course, able to take care of his normal personal needs. In addition to his regular work he did odd jobs of painting, plumbing and the like. Petitioner's landlord and his wife fully corroborated his account of his day-to-day habits and activities.
The picture of Rodriguez which emerges from the record is that of a normal industrial unit, a non-English speaking, uneducated laborer, hard-working and industrious.
Following the accident and amputation  the record does not disclose the date  Rodriguez was fitted with an artificial left arm equipped with a metal device designed to open and close so that he could pick up and handle objects. Subsequent to the fitting he attended the Institute of Physical Medicine and Rehabilitation in New York City for two weeks, where he received instruction in the use of the device. However, this was not given in Spanish, nor even in English, but by gestures. It appears that because of this inadequate instruction petitioner was able to make only limited use of the device while it was in working order. It broke some five months before the hearing, but he did not have it repaired.
The proofs were that since the accident Rodriguez has been unable to take care of his personal needs, such as dressing and bathing, and requires the help of his wife or friends. He cannot use the subway much because the presence of other people makes him nervous; they push him and he is afraid of falling. His family life has been affected. His social relations have been cut off because of his shyness and *347 sensitivity to the reaction of friends to his appearance  when he sees them he hides, and they have stopped coming to his home. His activities are confined to lying around the house; he is restless, upset and unhappy. He has tried to do odd jobs about the place but became dizzy and had to discontinue. He has a phantom pain where his left wrist would be, pains in his back, left chest and left thigh, and continuous headaches at night. He cannot always maintain his equilibrium. The artificial arm is too heavy and illfitting; it is a source of embarrassment, and when in public he holds the end of it in his pocket because of the remarks people make. He gets nervous, dizzy and sick when he looks at people, as was dramatically manifested when he suffered a dizzy spell on the witness stand and a recess had to be taken. Almost all of these details were corroborated by his wife and the landlord. But what is more important is the fact that petitioner has not worked since the accident. He exhibited a list of 40 different factories where he applied for work. His efforts to find employment have been fruitless and frustrating.
This account of the change in petitioner's physical, mental and nervous condition and of his disability, based upon his testimony and that of his landlord and wife, must now necessarily be supplemented by reference to the medical testimony.
Dr. Visconti, an orthopedist, examined Rodriguez in December 1953 and December 1954. In addition to the amputated arm he found atrophy in the pectoral chest wall region and left scapular area due to disuse of the arm, a disturbance of the head, neck and left scapular muscles, a visible hernia, and a neurosis. In his opinion, petitioner's condition was causally related to the accident. He evaluated disability at 100% total for loss of the left arm, 10% of total for the atrophy, and an additional 7-1/2% of total for the hernia. From an orthopedic standpoint, it was his expert opinion that petitioner could do some work consistent with his disability; however, adding the neurosis to the orthopedic impairment, he was unemployable. On cross-examination *348 Dr. Visconti emphasized that individuals react differently to the loss of an arm: some accept the situation and adjust themselves accordingly, others may develop a severe neurosis. In this case he was considering the type of person petitioner was, including his background, education and particular reaction to trauma. Without taking into consideration the estimate of disability with respect to the hernia and the atrophy of the pectoral and scapular areas, petitioner's disability would still be 100% of total. Rodriguez, said the doctor, was no longer "a competitive unit."
Dr. Siegel, a neurologist and psychiatrist called by petitioner, had examined him, with special reference to neuropsychiatric features. He found an adult male of limited intelligence who seemed depressed, morose, sombre and tense, and who was obviously suffering psychiatric trauma as a result of the loss of his left arm. In his opinion the condition was causally related to the accident, and petitioner was suffering from a mixed anxiety depressive neurosis for which he had a neuropsychiatric disability of 12-1/2% of total. Whether a psychic trauma such as Rodriguez had would diminish or increase would depend on the individual. In his view, petitioner's "limited education is against him, with no improvement and adaptability as a result of some neurosis that he has had."
Respondent's first medical witness was Dr. Furman, who had treated petitioner during his two weeks in the hospital and thereafter weekly until the beginning of November 1953. He estimated disability at 100% statutory loss of the left arm. Cross-examination revealed that he had never taken a history from the petitioner while he was under his care, nor had he ever physically examined him except for the injured part. Nevertheless, he denied the presence of atrophy of the chest region or scapular area. If atrophy were present Dr. Furman would change his estimate of disability. He would not hire Rodriguez or pass him for a job requiring heavy labor, although he believed he could do work requiring no skill, using *349 his right hand. Significantly, in arriving at his estimate of disability Dr. Furman had not considered petitioner's background, education or adaptability.
Dr. Watman, who had examined Rodriguez at respondent's request in March 1954, estimated disability at 100% of the left arm and 5% of total for the hernia. He admitted that in arriving at his estimate of disability he had not taken into account petitioner's home life, training, education, prior work or background. Respondent's final medical expert was Dr. Medinets, a neurosurgeon, who also examined petitioner in March 1954. He found no neurological disability. He indicated that some individuals adjust to the loss of a portion of their body in a normal way, and others abnormally, but in his opinion petitioner's adjustment was normal under the circumstances, these having been detailed to him in an hypothetical question put on cross-examination.
The deputy director found that petitioner had suffered an "organic, orthopedic and functional neurological disability, superimposed on his meagre educational background, his aptitude and vocational training, his lack of knowledge of the English language," and concluded on the basis of all the testimony that he had been rendered unemployable, that his disability was total and permanent, and he was therefore entitled to compensation for the statutory 450 weeks at $30 a week. Upon the expiration of that period he would be entitled to an extension of compensation, subject to such physical or educational rehabilitation as might be ordered by the Rehabilitation Commission, and such periodic reconsiderations and extensions as the case might require, as prescribed by N.J.S.A. 34:15-12(b).
On appeal, the County Court, after reviewing the testimony, reached the conclusion that much of petitioner's neurosis stemmed from his discouragement and disillusionment with the prosthesis furnished him by respondent; the mechanism was broken and useless, and moreover petitioner had received no instructions from a Spanish-speaking instructor in its use. As noted, the court directed that respondent rectify and perfect the prosthesis and arrange for *350 instructions by a Spanish-speaking instructor in order to make petitioner proficient. In granting Rodriguez 100% for the loss of the left arm and 12% of total permanent disability for his orthopedic and neurological injuries, the court noted that should petitioner's condition worsen or his incapacity increase, he would have his remedy under N.J.S.A. 34:15-27, which provides that an award may be reviewed within two years from the date when the injured person last received payment, upon the application of either party, on the ground that the incapacity of the injured employee had subsequently increased.
In support of the correctness of the County Court judgment, respondent's brief contains the shadow of a suggestion that petitioner's injury being a "scheduled" one, compensation could perhaps be limited to what is provided for in N.J.S.A. 34:15-12(p), namely, 66-2/3% of daily wages during 300 weeks for the loss of an arm. Such a suggestion comes more than 20 years too late in the development of our compensation law. The argument was considered and rejected in Sigley v. Marathon Razor Blade Co., Inc., 111 N.J.L. 25, 29 et seq. (E. & A. 1933), affirming an award for total loss of one eye plus 10% of total permanent disability for impairment due to neurosis resulting from the accident. The court there noted that whereas paragraphs (c) to (v) of the Workmen's Compensation Act schedule of payments (now N.J.S.A. 34:15-12(c) to (v)) provided compensation for specified injuries resulting in loss of a member or function, there was also paragraph (w), requiring compensation in all "lesser or other cases involving permanent loss, or where the usefulness of a member or any physical function is permanently impaired * * *," a provision not without significance in considering the clear legislative purpose to provide compensation for unscheduled as well as scheduled disabilities.
Our courts have continued to look upon the statute as remedial in nature, to be liberally and broadly construed to effectuate its beneficent purposes. They have avoided any construction of the compensation schedule like the one advanced *351 in Sigley, and here, as leading to a harsh, unjust and unreasonable result.
We can accept respondent's contention that "[t]hose disabilities naturally attendant upon the loss of an arm must be presumed to be encompassed within the act and indemnified by the compensation prescribed in the pertinent paragraph [p] of the schedule," if we strictly limit the reach of the argument to only such disabilities as petitioner's relative difficulty in dressing, bathing, eating, and other manual incapacities. We cannot bring this particular individual's psychoneurotic reaction to the accident and loss of an arm, and the impairment or even destruction of elements of his personality, within the ambit of respondent's comprehensive but unacceptable claim.
As a matter of record, respondent recognizes that in a proper case, upon proof of an injury resulting in disability separate and apart from that flowing from the scheduled loss, such additional disability may be compensable, as in Sigley. Respondent further admits it to be equally true that the loss of a single member or the function thereof may, because of the effects upon total efficiency, be deemed to result in total disability. Such, in fact, was the holding in Simpson v. New Jersey Stone & Tile Co., 93 N.J.L. 250 (E. & A. 1919); Coates v. Warren Hotel, 18 N.J. Misc. 122 (W.C.B. 1940), modified Ibid, 18 N.J. Misc. 363 (C.P. 1940), and Kalson v. Star Electric Motor Co., 15 N.J. Super. 565 (Cty. Ct. 1951), affirmed 21 N.J. Super. 15 (App. Div. 1952). Respondent claims that these may be distinguished because in each the employee suffered extreme pain which prevented gainful employment. We do not consider the broad principle projected in those cases, especially Kalson, as permitting of so narrow a distinction.
Soon after the passage of the Compensation Act in 1911 it was decided in Burbage v. Lee, 87 N.J.L. 36, 38 (Sup. Ct. 1915), that the "disability" of which the statute speaks is not restricted to such as results in immediate impairment of earning power, "but embraces any loss of physical function which detracts from the former efficiency of the body or its *352 members in the ordinary pursuits of life." This view was restated and approved by the Court of Errors and Appeals in Everhart v. Newark Cleaning and Dyeing Corp., 119 N.J.L. 108, 111-112 (1937), and has been the law of this State since. See, for example, Stepnowski v. Specific Pharmaceuticals, Inc., 18 N.J. Super. 495, 499 (App. Div. 1952). But see 2 Larsen, The Law of Workmen's Compensation (1952), § 57, p. 1, particularly §§ 57.10, 57.21 and 57.31, pp. 2, 4 and 10, for an interesting discussion of the proper balancing of the factors of wage-loss and medical incapacity in determining disability.
Respondent makes the point that Rodriguez is able to get about and can undoubtedly get some kind of work, undefined. This completely ignores the drastic change wrought by the accident on petitioner's psychoneurological condition, his mental outlook on life generally, and his personality factors, all superimposed upon his physical disability. He would have to find employment in the labor market on a competitive basis. There is convincing proof in the record that in his present condition he could not pass a pre-employment physical examination. The Kalson case, above, which comprehensively reviews previous decisions, held:
"A workman does not have to be bedridden to be totally and permanently disabled (Jersey City Printing Co. v. Klochansky, 8 N.J. Super. 186 (App. Div. 1950)); he need not be absolutely disabled or totally paralyzed (Cleland v. Verona Radio [Inc.], 130 N.J.L. 588 (Sup. Ct. 1943)) or completely unable to get about (Hayes v. First Baptist Church of Bloomfield, 18 N.J. Misc. 139 (N.J. Dept. of Labor 1940)). Nor is ability for light or intermittent or sedentary work inconsistent with total disability. Jersey City Printing Co. v. Klochansky, supra; Clark v. American Can Co., 4 N.J. 527, 534 (1950). And the fact that only one member is involved does not prevent such a finding. Simpson v. New Jersey Stone & Tile Co., supra; Coates v. Warren Hotel, 18 N.J. Misc. 363 (Com. Pl. Ct. 1940)." 15 N.J. Super., at page 573.
Considered in the light of the liberal construction which the Workmen's Compensation Act should receive, total disability is not to be interpreted literally as utter and abject helplessness. The rule which should guide us has been well *353 stated in Lee v. Minneapolis Street Ry. Co., 230 Minn. 315, 320, 41 N.W.2d 433, 436 (Sup. Ct. 1950):
"An employee who is so injured that he can perform no services other than those which are so limited in quality, dependability, or quantity that a reasonably stable market for them does not exist, may well be classified as totally disabled."
Cf. National Fuel Co. v. Arnold, 121 Colo. 220, 214 P.2d 784 (Sup. Ct. 1950); Texas Indemnity Insurance Co. v. Bonner, 228 S.W.2d 348 (Tex. Civ. App. 1950); Dietz v. State, 157 Neb. 324, 59 N.W.2d 587 (Sup. Ct. 1953). And see Larson, op. cit., § 57.51, pp. 27-28, noting that the test quoted from the Minnesota opinion and applied in the cited cases is essentially the same as the so-called "odd lot" doctrine, a term used to refer to workers who, while not altogether incapacitated for work, are so handicapped that they will not be employed regularly in any well-known branch of the labor market, the essence of the test being "the probable dependability with which claimant can sell his services in a competitive labor market, undistorted by such factors as business booms, sympathy of a particular employer or friends, temporary good luck, or the superhuman efforts of the claimant to rise above his crippling handicaps."
Inability to get work, traceable directly to the compensable injury, may be as effective in establishing disability as is inability to perform work. Larson, op. cit., § 57.61, p. 30. Assuming for the moment that Rodriguez was not a psychoneurologically impaired individual, the proof nonetheless is that he has been unable to obtain gainful employment. Respondent is presently critical of petitioner's proof that he has been unable to get a job, as evidenced by the long list of places where he unsuccessfully sought employment. It claims that the list does not show the dates nor over what period of time petitioner sought employment, or what the appearance of his prosthesis on those occasions was. But respondent did not cross-examine upon the list and made no effort to show that Rodriguez did not diligently and sincerely *354 seek employment wherever it might possibly be found. Petitioner's past record shows him to have been, prior to the accident, a hard worker who would take any kind of job to make a living, no matter how demanding or disagreeable.
The plain fact is, and the deputy director so found, that petitioner is no longer an employable unit. This is not so merely because he lacks an arm or, in addition, suffers from a psychoneurotic disturbance. Just as did the deputy director, so must we look upon Rodriguez as he is today  the man as a whole. We must consider his background, limited education, inability to speak or understand English, his particular reaction to the trauma, his limited aptitudes and vocational training, as well as the loss of the arm. There is no suggestion in the record that Rodriguez is a malingerer or that he has voluntarily withdrawn from the labor market to spend his remaining days in idleness. Respondent took Rodriguez as it found him, with all the latent constitutional infirmities which came to the fore and exhibited themselves subsequent to the shattering experience of having his arm mangled and amputated.
The deputy director had a first-hand opportunity to observe petitioner and to evaluate his credibility and infirmity. He also brought to the case the expertness which a long and intense experience in the Division has given him. The minds of the deputy director and the County Court judge both operated upon the same basic facts relating to petitioner's present physical, mental and neurological condition. They drew different conclusions from those facts. Although we review the County Court judgment, we are not insensitive to the opportunities and experience of the deputy director, sitting as hearer, to appraise the petitioner as an individual and to judge the testimonial worth of the witnesses, lay and expert, as contrasted with the evaluation which the County Court must give to an impersonal, desiccated record. In our view, the record supports the deputy director's finding of total permanent disability. Petitioner's proofs established the essential and indispensable elements of his claim by a preponderance of the evidence.
*355 Our determination makes it unnecessary to pass upon that phase of the appeal which relates to whether Rodriguez suffered a compensable hernia as a result of the accident.
Respondent may, of course, at any time initiate proceedings to review the award for total permanent disability on the ground that the disability has diminished. N.J.S.A. 34:15-27. With a view toward perhaps again making petitioner at least a partially efficient economic unit, respondent might well undertake, through the Division, to supply petitioner with an effective prosthesis, seeing to it that he gets thorough instruction in its use through a Spanish-speaking instructor and, if possible, get Rodriguez to accept instruction in English.
The County Court judgment is reversed and the determination, award and rule for judgment of the Workmen's Compensation Division reinstated.