46 N.J. Super. 135 (1957)
134 A.2d 29
ROMAN POLULICH, PETITIONER-RESPONDENT,
v.
J.G. SCHMIDT TOOL DIE & STAMPING CO., RESPONDENT-APPELLANT.
Superior Court of New Jersey, Essex County Court, Law Division.
Decided June 24, 1957.
*137 Mr. James J. Carroll, attorney for respondent appellant (Mr. Frank Fink, of counsel).
Mr. Sam Freeman, attorney for petitioner-appellee (Mr. Seymour B. Jacobs, of counsel).
Mr. Grover C. Richman, Jr., Attorney-General of New Jersey, amicus curiae (Mr. Thomas L. Franklin, of counsel).
GAULKIN, J.C.C.
The petitioner was awarded compensation for increased disability and respondent appeals. Respondent raises two points  first, that the deputy, without legal authority and without the consent of the respondent, had the petitioner examined by an expert chosen by the deputy whom he thereafter called as a witness, and the deputy based his decision in part on his testimony; and second, that the petitioner did not establish an increase of disability.
Petitioner was injured June 18, 1951, as a result of which the first, second, third and fourth fingers of his right hand were amputated. Following a formal hearing on June 4, 1952 petitioner was awarded 75% disability of the right hand and 5% of total disability for a consequent neurosis. In May 1955 petitioner filed his petition for increased disability, and hearings were held thereon October 18 and November 1, 1955, and March 14, 1956, following which the deputy made the award appealed from.
At the latter hearings petitioner produced Dr. Vincent J. Riggs, who had testified for petitioner in the 1952 hearing, and Dr. Jack Chernus. In the 1952 hearing Dr. Riggs had testified that the petitioner's disability by reason of neurosis was 12 1/2%. Now he found his disability due to neurosis to be 50%. Dr. Chernus also found his present disability due to neurosis to be 50%.
The respondent called Dr. Jack Blumberg, who had also testified in 1952, at which time he had estimated petitioner's disability due to neurosis to be 2 1/2%. Dr. Blumberg testified that in his opinion there had been no increase in that disability, and it was still 2 1/2%.
*138 Faced with this wide discrepancy the deputy director decided to have the petitioner examined by the best impartial neuropsychiatrist he could find available for that purpose. The deputy made a very candid and interesting statement of his reasons for what he did, as follows:
"I think I would be remiss in my duty if I were to make a decision in a case when I feel insecure in making it. I feel insecure in making this decision because the medical testimony presented at the hearing of the matter was so divergent that I, as a layman, was unable to determine where the medical facts lay. I feel the duty in the Compensation Division in such a case is to find out what the facts are by whatever fair means the Division can devise which would not prejudice either party.
Because of the marked divergence between the findings and estimates of the opposing medical experts, that is, 2 1/2 per cent disability by the respondent's and 50 per cent by petitioner's medical experts, I felt that the evidence presented did not provide a basis upon which I could render a reasonable decision. I was not intellectually secure as to the medical facts. The situation called for the expression of opinion by an impartial, disinterested neuropsychiatrist, based on a complete, neuropsychiatric examination of the petitioner.
I therefore wrote to the attorneys for both parties, requesting that they have the petitioner examined by Dr. Henry Davidson, a neuropsychiatrist who had been recommended to me by the Medical Director of the Division of Workmen's Compensation. Neither attorney had any part in the choosing of Dr. Davidson. Dr. Davidson is a Diplomate of the American Board of Psychiatry; he has had ten years' experience in Workmen's Compensation practice, and seven years' experience as an examiner in disability appeals in the Veterans' Administration. * * *
Dr. Davidson testified as to the result of his examination in the presence of both attorneys. The attorney for the respondent objected to the use of an outside physician, but has objection was overruled. It is my duty to ascertain the medical facts. If there is not sufficient concurrence in the findings or estimates of disability as between the respondent's and the petitioner's experts, so as to present a reasonable basis for a decision, and if I did not attempt to learn the true medical picture, with competent supplemental information if necessary, I would be remiss in my duty.
It is my opinion and firm conviction that this Division has every right to have a petitioner examined by a competent, outside physician as a means of assisting the hearing officer to determine the true medical facts, where the opposing attorneys have the opportunity to cross examine such outside physician and when neither attorney is involved in the choosing of such physician and when the physician selected has no interest, other than a medical one, in the case." *139 Respondent objected vehemently and refused to cross-examine. For the purposes of this appeal it will be taken as established that the respondent objected to the appointment of Dr. Davidson from the beginning.

I.
Respondent argues that (1) even a judge has no right to call an expert over the objection of counsel, and (2) assuming a judge has that right, a deputy does not, because he is not a "judge" and the Workmen's Compensation Division is not a "court."
For the decision of this case, it is unnecessary to decide each and every respect in which a deputy is like or unlike a "judge," and the Division like or unlike a "court." For present purposes it is sufficient to note that the Division is a fact-finding tribunal, and the deputy a trier of fact. The deputy, like the judge sitting without a jury, is seeking the truth, and to find it he is empowered to do all that a judge sitting without a jury may do. Indeed, it has been argued that those who sit in administrative tribunals may do even more than a judge. Davis, "Evidence in the Administrative Process," 55 Harv. L. Rev. 364 (1942). For example, the deputy is not bound by the rules of evidence, R.S. 34:15-56; Scalise v. Uvalde Asphalt Paving Co., 98 N.J.L. 696 (Sup. Ct. 1923). And R.S. 34:15-50 provides that under certain circumstances, "if no petition is filed by the injured employee * * * the bureau may institute an inquiry on its own motion, to determine the reasons for the failure to agree as to compensation, and may * * * with the consent of the injured employee * * * file a petition for compensation. When such petition is filed by said bureau, on its own initiative, the subsequent proceedings shall be the same as * * * where the claimant files a petition." Cf. Krauss v. A. & M. Karagheusian, 13 N.J. 447, 457 (1953).
Wigmore said "* * * the general judicial power itself * * * implies inherently a power to investigate as auxiliary *140 to the power to decide; and the power to investigate implies necessarily a power to summon and question witnesses." 9 Wigmore on Evidence (3d ed.), § 2484, p. 267. Respondent replies that even if a judge has that "inherent" power, a deputy has no "inherent" power, but only those powers expressly given him by the Workmen's Compensation Act.
No basis in reason is offered for the distinction and I can see none. The deputy has "exclusive original jurisdiction" to hear and determine the facts in workmen's compensation cases, R.S. 34:15-49. The Division is the trial tribunal (if we are to avoid the word "court") in these cases. No other tribunal hears and sees the witnesses. Appeals are based "exclusively" on the record made before the deputy (R.R. 5:2-5(d)), and for that reason the appellate tribunals give the findings of the deputy great weight. If the deputy does not have the power "to investigate as auxiliary to the power to decide" which, as Wigmore said, "implies necessarily a power to summon and question witnesses," then no one has that power in workmen's compensation cases.
Since the whole scheme of the Workmen's Compensation Act is thus based upon the expectation that the deputy will, so far as a fact-finding tribunal devoted to justice can, find the truth, no construction should be adopted, unless clearly compelled, which would give the deputy fewer powers with which to find the truth than those possessed by a trial judge.
What, then, are those powers of the trial judge? Specifically, may a trial judge, under similar circumstances, call an expert as a witness over the protests of the parties?
It is argued that there is no New Jersey case squarely holding that a trial judge may do so. Perhaps that is so. In Morrone v. Morrone, 44 N.J. Super. 305 (App. Div. 1957), the court appointed "his own" handwriting expert, but whether that was opposed by the parties does not appear, and no point was made of it on appeal.
An interesting early case is Newark Plank Road & Ferry Co. v. Elmer, 9 N.J. Eq. 754 (E. & A. 1855), in which complaints sought an injunction to abate a nuisance created by defendant's piers in the Passaic River. Chief Justice *141 Green sat for the chancellor, who was disqualified. After the hearing he said (Id., at page 771), there were many points "affecting the question at issue * * * in regard to which there is much conflict of opinion among the witnesses, and upon which the court, upon the evidence before it, is not warranted in expressing an opinion. * * * It is important * * * that these questions be settled * * * and to this end I am of opinion that it should be referred * * * to ascertain and report to this court the depth of water necessary to float boats of suitable dimensions to be used at said ferry; the distance to which the piers * * * should extend into the river for the proper accommodation of such boats; the necessity, if any there be, for the use of pilings * * *," etc.  all matters for experts. Over the objection of defendants, the matter was referred to three "masters of said court." One of the masters was indeed a lawyer, but the other two were experts "eminently qualified * * * who were selected * * * with the approbation of both parties."
The masters reported that they "visited and inspected the ferry and premises * * * and the boat now used * * * and * * * the operation thereof * * * and have also taken the depositions of divers witnesses produced before us by the parties * * * and also of witnesses called by ourselves at our own instance * * *." (At page 775, emphasis added). Then followed their conclusions, to which defendants excepted. In rejecting an attack upon the right to refer the matter to experts, Chief Justice Green said (at page 784):
"The object of the reference was not to obtain a judicial decision of any question, but merely to inform the conscience of the court upon certain questions of fact. These questions had been submitted to the determination of the court, upon evidence taken in the cause. The Court might regularly have decided the case upon that evidence. But the questions being of a nature which rendered a personal examination of the premises, by persons possessed of practical and scientific skill, highly desirable, if not absolutely necessary, they were referred to persons possessing such qualifications * * *. It was believed that their investigation would lead to a more satisfactory result than either the direct and immediate action of the court * * * or a trial by jury."
*142 The exceptions were thereupon overruled, and the report of the masters formed the basis for the injunction; all of which was then affirmed by the Court of Errors and Appeals.
Chief Justice Green there obviously exercised the "power to investigate as auxiliary to the power to decide." It is to be noted that the chief justice went farther than the deputy did in the case at bar, for the experts were not called as witnesses and submitted for cross-examination there, as was Dr. Davidson here. Admitting all the distinctions, historical, procedural and otherwise, between a suit in equity and other proceedings, the fact remains that what Chief Justice Green did was in quest for truth, and reasonably calculated to obtain it.
However, if we admit that there is no New Jersey case which holds that a trial judge has the right to call an expert designated by him as a witness, it seems to me that reasoning from the basic philosophy of our judicial system, as reflected in analogous situations since earliest times, logic compels the conclusion that the trial judge does have that right. As Wigmore pointed out, the way a court will answer questions such as these depends, in the last analysis, on the philosophy of the Court. 6 Wigmore, sec. 1845. If it is wedded to the sporting theory of justice, in which the judge is an umpire calling balls and strikes but pitching none, then the answer of course would be that the judge has no right to call any witness, expert or not. But New Jersey never accepted the sporting theory of justice, and is less inclined to do so today than ever before.
For example, contrary to the rule in many other jurisdictions, our judges have always had the right to comment on the evidence. Castner v. Sliker, 33 N.J.L. 507 (E. & A. 1869); Isherwood v. Douglas, 34 N.J. Super. 533 (App. Div. 1955); Davis v. Gibbs, 23 N.J. Super. 558 (App. Div. 1952). It has even been said that in some cases it may even be the duty of the judge to do so. Davis v. Gibbs, supra, 23 N.J. Super. at page 562; State v. Peterson, 10 N.J. 155, 162 (1952); State v. Hummer, 73 N.J.L. 714, 719 (E. & A. 1906). And it has always been the right *143 of our trial judges to put additional questions to a witness, State v. Manno, 29 N.J. Super. 411 (App. Div. 1954); Highway Trailer Co., Inc. v. Long Branch Auto Co., 114 N.J.L. 317 (E. & A. 1934); and that, too, in some cases, is a duty. State v. King, 133 N.J.L. 480, 483 (Sup. Ct. 1945), affirmed 135 N.J.L. 286 (E. & A. 1946).
The judge need not wait to be asked to act on any matter by counsel. Electric Park Amusement Co. v. Psichos, 83 N.J.L. 262 (Sup. Ct. 1912); Wisniewski v. Weinstock, 130 N.J.L. 58 (Sup. Ct. 1943), affirmed 135 N.J.L. 202 (E. & A. 1946); Mitilenes v. Snead, 45 N.J. Super. 246 (App. Div. 1957). Indeed, it is often his obligation to act when counsel do not object, or when they acquiesce, or even over the objection of both counsel, for if he fails to act when he should, reversal may result for "plain errors affecting substantial rights of the defendant, although they were not brought to the attention of the trial court." (R.R. 1:5-1; 1:5-3(c)); In re Stern, 11 N.J. 584 (1953); State v. O'Leary, 110 N.J.L. 36 (E. & A. 1932); cf. State v. Pontery, 19 N.J. 457 (1955); State v. Steensen, 35 N.J. Super. 103 (App. Div. 1955). And our appellate courts have the right to and do remand cases for more testimony, or for testimony which the parties themselves did not offer. McBride v. Royal Laundry Service, Inc., 44 N.J. Super. 114, 119 (App. Div. 1957); Grant v. Grant Casket Co., 137 N.J.L. 463, 465 (Sup. Ct. 1948), affirmed 2 N.J. 15 (1948). One reason for this was well stated in Electric Park Amusement Co. v. Psichos, supra, in which the judge on his own motion stopped a witness from testifying as an expert on the ground he was not qualified. In affirming, the Supreme Court pointed out that it was essential that the trial judge have that power (Id., 83 N.J.L. at page 267) "* * * in order to prevent chaos in the trial of causes and to attain substantial justice. It is therefore clearly against the policy of the law that the legal principles which control the admission or rejection of testimony should be subject to be waived by consent of the litigants, without the consent of the court. * * *"
*144 In Mitilenes v. Snead, supra, in sustaining the action of a trial judge who, on his own motion, excluded possibly misleading questions on cross-examination, the Appellate Division said "neither the trial court nor the opposing party could be forced into the position of buying a pig in a poke."
It is upon this idea that neither the litigants nor the court shall buy a pig in a poke that our discovery and pretrial procedure are bottomed. Discovery and pretrial, as we now have them, are our latest and most emphatic rejection of the sporting theory of justice. 6 Wigmore, supra, sec. 1845.
Perhaps we do not go so far as to say, as did Edmund Burke, that "a judge is not placed in that high situation merely as a passive instrument of the parties. He has a duty of his own, independent of them, and that duty is to investigate the truth" (9 Wigmore, supra, sec. 2484; and see Justice Frankfurter's statement in Johnson v. U.S., 333 U.S. 46, 54, 68 S.Ct. 391, 396, 92 L.Ed. 468 (1948)). But we do agree that
"he is not a dumb and mask-faced moderator over a contest between sensitive and apprehensive, or perhaps wily and ingenious, counsel. He is a vital and integral factor in the discovery and elucidation of the facts. * * * Therefore, on his own account, he is not obliged to rest content with the modicum of evidence which counsel may dole out, or to accept as final their showing of knowledge * * * and credibility * * * of witnesses. But beyond this it is the function of the judge to aid the jury in obtaining a comprehension of the facts equal to his own, in order that a just verdict may be reached. Therefore, whenever in his judgment the proceeding is not being conducted in a way to accomplish the purpose for which alone it is instituted, the full development of the truth, or whenever he can effect a better accomplishment of that purpose, he not only has the right, but it is his duty, to take part. Limitations upon this power appear from the statement of the purpose to be subserved, and are merely those which good sense and propriety suggest. The judge should not place himself in the attitude of helping or hurting either side, but, whenever it appears to him proper, he should fearlessly endeavor to develop the truth with all possible clearness and certainty, which ever side the truth may help or hurt." State v. Keehn, 85 Kan. 765, 118 P. 851 (Sup. Ct. 1911), quoted in 3 Wigmore, sec. 784.
Of course, the power to take an active part in the trial of a case must be exercised by the judge with the greatest *145 restraint, especially before a jury. As Judge Wyzanski pointed out in A Trial Judge's Freedom and Responsibility (1952), perhaps no problem troubles a trial judge as much as the question when and how to use that power. Most trial lawyers feel strongly that the judge should never "interfere," and when one ascends the bench the one thing he is sure of is that he will not "meddle." He soon learns that that is impossible  that occasionally he must play an active role, not only to prevent injustice, but to be sure that justice is done. Wigmore (sec. 784) quotes from The Trial Judge, in which Justice Lummus made this excellent statement:
"The judge must never become or appear to be a partisan. But a judge need take no vow of silence. He is there to see that justice is done, or at least to see that the jury have a fair chance to do justice. If by reason of the incompetence or inexperience of counsel on one side or on both sides, the case is not being presented intelligibly to the jury, he may bring out the important facts by questions to the witnesses. If a cross-examiner has obtained a delusive verbal victory over a witness, and the jury may be misled, a question by the judge will often set the matter right at once. The objection attributed to a number of famous advocates, `If your Honor is asking that question for us, we don't want it, and if against us we object to it,' may find a sympathetic response in a part of the bar, but it shows a low conception of the function of the bench. * * * The judge ought not to let the jury be diverted from the real issue. The skill of counsel must not be allowed to mislead the jury by raising false issues or by appeals to emotion and prejudice. * * * It is not always easy for a judge to see his duty clearly. But a first-rate trial judge will find and tread the narrow path that lies between meddlesomeness on the one hand and ineffectiveness and impotence on the other."
Which brings us to the question at bar  was it within his power, and just, for the deputy to choose his own expert, have him examine the petitioner, and call him to testify? I think it was.
The problem of the fee'd medical expert has been discussed too often, and at too great length, to require elaboration here. See, for example, the pungent comments under Rule 59 of the Report of the Committee on the Revision of the Law of Evidence to the Supreme Court, and the authorities therein cited.
*146 If the judge suspects the "expertness" or the honesty of the experts on both sides, what is he to do? Or where, as here, the judge does not doubt their expertness, and has no basis upon which to discount their credibility, but the testimony is as far apart as it was here, what is he to do?
It is sometime said that in evaluating the credibility of a witness, the trier of fact may take into consideration the inherent probability of his testimony tested by common human experience, the surrounding circumstances, the demeanor of the witness, his manner of testifying, etc. These are of little or no use in evaluating the credibility of an expert. The deputy well stated his dilemma when he said "the medical testimony * * * was so divergent that I, as a layman, was unable to determine where the medical facts lay." In short, when the experts are as far apart as these, what means does the trier of fact have to decide which expert's testimony to accept? He may lean toward one side, but how can he be sure? What can he do?
He can say the party who has the burden of proof has failed to sustain it, but then there is an even chance that he has done "injustice according to law." Must he say that? Is it not more reasonable, more just, more consistent with the philosophy of our law, to permit him, in a proper case, to call in a neutral expert, not to displace the others, but for whatever light that expert might throw on the problem?
Perhaps the deputy could have used a different method in providing for an expert. For example, he might have followed the practice outlined in Rule 28 of the Federal Rules of Criminal Procedure, 28 U.S.C.A., or the practice proposed in Rule 59, supra. Had either of those outlined rules, or any rule, been adopted in New Jersey at the time of the deputy's action, I am sure he would have followed it. However, there were no binding rules, as there are none now, and therefore the deputy used the means that seemed to him best. Perhaps another deputy might have used other means, but that does not make the means used by the deputy below improper or an abuse of his discretion.
*147 Perhaps the deputy will be influenced more by "his" expert's testimony than by the testimony of an additional expert called by the party, but what of that? Every trier of fact is influenced by the knowledge that a witness is disinterested, but that does not mean that the trier of fact will in every case accept the testimony of the disinterested witness, and it is not to be presumed that a judge will be controlled by or accept as gospel the testimony of the expert selected by him. Cf. Morrone v. Morrone, supra. Indeed, Rule 61 in the Report of the Committee on the Revision of the Law of Evidence to the Supreme Court (1955) recognized the propriety of giving weight to the fact that the expert is disinterested. Compare the comment under Rule 61, supra, with the proposed Rule 59 and the comment thereunder in the Report of the Commission to Study the Improvement of the Law of Evidence to the Senate and General Assembly (1956).
The power and the right of a judge to call an expert to his assistance dates from the 14th Century, and the text writers all agree that he should have it today, and indeed in most cases in which the question has arisen it has been held that he does have that right. Beuscher, "The Use of Experts by the Courts," 54 Harv. L. Rev. 1105, 1127 (1941); 9 Wigmore, sec. 2484; McCormick, Evidence (1954), sec. 8, p. 12; 70 C.J., Witnesses, sec. 723; 53 Am. Jur, Trial, sec. 46.
Wigmore said (sec. 2484):
"[The judicial power] implies inherently a power to investigate as auxiliary to the power to decide; and the power to investigate implies necessarily a power to summon and to question witnesses.
The trial judge, then may call a witness not called by the parties, or may consult any source of information on topics subject to judicial notice, or may put additional questions to a witness called by the parties, or may `ex mero motu' exclude inadmissible evidence, or may take a view of a place or thing.
The appointment of disinterested expert witnesses by the Court is one of the expedients employed for reforming the defects of the partisan system of providing such testimony.
That the trial judge has no power to cause the evidence produced by the parties to be supplemented, never will be conceded, so long as the Bench retains a true conception of its constitutional function *148 and a due sense of self-respect. There could not have been any question on this subject, had not the modern American legal mind been led astray by its habituation to the paralyzing effect of another rule, wholly modern, viz. the rule forbidding the trial judge to comment to the jury on the weight of evidence."
McCormick, supra, at page 14, says:
"Not only may the judge examine witnesses called by the parties, he may also, for the same purpose of bringing out material facts that might not otherwise be elicited, call witnesses himself whom the parties might not have chosen to call."
The same authority proceeds to point out that one of the uses of this power is
"to mediate the battle of partisan expert witnesses employed by the parties, through the court's resumption of its ancient power to call an expert of his own choosing, or one agreed upon by the parties, to give impartial testimony to aid the court or jury in resolving the scientific issue. But the judge's power of calling witnesses in aid of justice is general and not limited to meeting these particular needs."
In further comment upon the trial judge's "common law power to call experts," McCormick says the following (sec. 17):
"Cases are recorded as early as the 14th century  before witneses were heard by juries  of the summoning of experts by the judges to aid them in determining scientific issues. The existence of the judge's power to call witnesses generally and expert witnesses particularly seems fairly well recognized in this country."
70 C.J., Witnesses, sec. 723:
"A trial judge may, of his own motion, call to the stand witnesses who have not been called by either party, against the will of either party in the furtherance of justice; or, when necessary to arrive at the facts, recall a witness in order to question him further. It is within the sound discretion of the trial court to call, of its own motion, an expert witness."
The necessity for such a rule was as obvious to the Minnesota Supreme Court as it was to the deputy here, for that *149 court said in Steenerson v. Great Northern Ry., 69 Minn. 353, 377, 72 N.W. 713, 716 (1887), quoted in Beuscher, supra, at 1107:
"Before a judge can act intelligently in such a matter, he must have an amount of this special knowledge and experience which it will take him years to acquire. It is not sufficient that he take his first lessons from the partisan, and perhaps perjured, experts, or so-called experts, produced by the parties at the trial. He must have a broader, clearer, and surer grasp of the subject than he can get from any such unreliable lessons."
See also, "Experts as Consultants to Courts," 74 N.J.L.J. 28 (1951); cf. Judge Wyzanski's comment, 74 N.J.L.J. 52 (1951).
Beuscher says (supra, at 1105) Dean Pound called the insistence on limiting the judge to what he can learn from party-called experts the "exaltation of incompetency. * * *" Also, Beuscher points out, not every "expert" is expert, and he quotes the comment of H.L. Mencken (in The American Language, p. 291):
"Next to engineer, expert seems to be the favorite talisman of Americans eager to augment their estate and dignity in this world. Very often it is hitched to an explanatory prefix, e.g., housing-, planning-, hog-, erosion-, marketing-, boll-weevil-, or sheep-dip-. * * *"
In short, I see no reason to criticize, much less to reverse, the deputy for what he did in this case.

II.
An examination of all of the testimony, including that of Dr. Davidson, satisfies me that the petitioner has established an increase in disability. It may be true, as respondent urges, that the physical manifestations that were seen by the doctors in their most recent examinations did not differ too radically from those which were seen by Dr. Riggs when he examined the petitioner in 1952, but a neurosis is not something that can be seen completely by a doctor in an examination. *150 The case at bar seems to me a good deal like Rodriguez v. Michael A. Scatuorchio, Inc., 42 N.J. Super. 341 (App. Div. 1956). Here, as there, we have a petitioner who is a foreigner, and who speaks little or no English. He testified through an interpreter. Prior to the accident he was employed as a power press operator, and after the amputation of his four fingers, that occupation was no longer open to him. There is no indication that he is trained for any other occupation. After the 1952 hearing petitioner worked for about three months in a tavern for a friend as a handy man, but when his friend sold the tavern he was fired. He tried working in another tavern but after three days he lost that job because he did not speak English well enough. Thereafter he went to numerous factories for employment  he testified he went about 100 times, which was probably an exaggeration  without success, and apparently since about the end of 1952 or the beginning of 1953 he has had no other employment.
He says that prior to his accident he was keeping company with a girl, but that she broke off the engagement about three months after the 1952 hearing "because I didn't have a hand, because I have not got a job, because I cannot take her, support her, for a wife." This relationship appears to have been a rather casual one, and perhaps the attachment was not as close as "engagement," but I am satisfied that as casual as the relationship was, it was apparently the only female relationship the petitioner had. This relationship was terminated by the girl, and superimposed upon the other injuries to his personality resulting from the amputation, it added to his disability. There was also testimony, of not too great force or volume, that the petitioner engaged in social activities less after the 1952 hearing, but that, too, I consider as of secondary importance. What is most important, it seems to me, is that although the petitioner feared at the hearing in 1952 that he would never again be able to get a job, that was only a year after the accident. The last hearing was five years after the accident and four years after the 1952 hearing. The fear of being unemployed has *151 now apparently become a certainty in petitioner's mind. Whatever the fear did to him in 1952 has in the intervening four years widened and deepened, and I am satisfied that the percentage of disability due to neurosis grew with that. He testified that after the hearing in June 1952 he thought he might be able to get a job, but over the years he has been unable to do so; he doesn't like to associate with people now because every one of his friends is leaving him because he has no money and no job. Dr. Riggs stated that the prolonged period of looking for work from 1952 to 1956 was much more of a psychic trauma than the short period between the accident and the hearing.
It is true that the amount of increase in disability can be based only upon the testimony of Dr. Riggs, since he is the only one who examined petitioner and knew his condition in 1952. However, the testimony of Dr. Chernus and Dr. Davidson may be received, as it was received by the deputy, to corroborate the testimony that the petitioner is now suffering from a moderately severe psycho neurosis.
Dr. Riggs had testified in 1952 that the neurosis then was 12 1/2%, and in 1956 he testified that it was 50%. After hearing all of the testimony and having had an opportunity to observe the petitioner, the deputy determined that the increase in disability was 25%. Giving the findings of the deputy the weight to which they are entitled and upon my own review of the testimony, I find the increase in disability to be 25%.
Judgment in accordance with the foregoing may be submitted.