76 N.J. Super. 461 (1962)
184 A.2d 878
RALPH LIGHTNER, PETITIONER-RESPONDENT
v.
SAMUEL F. COHN, RESPONDENT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued September 24, 1962.
Decided October 18, 1962.
*462 Before Judges PRICE, SULLIVAN and LEWIS.
*463 Mr. William M. Cox argued the cause for appellant (Messrs. Dolan and Dolan, attorneys; Mr. Lewis P. Dolan, Jr., of counsel).
Mr. Leslie S. Kohn argued the cause for respondent.
The opinion of the court was delivered by LEWIS, J.A.D.
Ralph Lightner, the victim of a compensable accident which occurred on March 10, 1954, suffered an injury to his right hand resulting in the amputation of the first three fingers and the distal phalanx of the thumb. During that year the Division of Workmen's Compensation awarded him 100% hand disability plus 5% of total permanent disability for derivative neurosis. There is no dispute as to the findings and determination of the Division at that time.
In 1960, pursuant to N.J.S.A. 34:15-27, Lightner filed a formal petition for review and modification of the prior award, alleging a subsequently developed accident-connected shoulder pathology and increased neurological impairment. At the hearing on this application he testified that his incapacitating condition had worsened since 1954 in that he currently experienced a burning sensation in his hand which traveled through the arm and "around in my shoulders"; he endured resultant pain all the time  "Nights especially"; it was only possible for him to lie on his left side or on his stomach; his right hand continued to shake and tremble; he was subjected constantly to dizzy feelings and headaches; and he was "all nervous and such."
Petitioner maintained that he had unsuccessfully tried to find work, saying, "When I go, they look at my hand and turn around and laugh. They say, `Man, you are crazy.'" Specifically, however, his efforts to seek employment were somewhat limited. He applied at a razor blade factory, a box manufacturing company and, on one occasion, he made inquiry of a friend, a street cleaner, as to the possibility of obtaining a job with the city as a "sweeper."
*464 The expert medical evidence reveals divergent opinions and accentuates an area of inexactness and uncertainty in the application of medical science to humanistic problems. There were six physicians produced as witnesses, and their testimony may be epitomized thusly:
 Dr. Vincent J. Riggs (for petitioner), a neurologist and psychiatrist, examined Lightner prior to the first hearing in 1954 at which time he estimated, in addition to a 100% disabled hand, permanent disability of 15% of total based upon posttraumatic neurosis. On re-examination in 1960 he found that the neuro-psychiatric disability had increased to 25%. Under cross-examination respecting the employability of the patient, he stated:
"Well, I have worked for large companies, examining patients for pre-employment, and I wouldn't accept him. * * * If I were working for Westinghouse, which I did once, and this man came in, I would turn him down."
However, he refused on redirect to express an opinion as to whether petitioner could successfully find work in the competitive labor market, contending that such an inquiry was "away from the psychiatric into the administrative field."
 Dr. Sidney Keats (for petitioner), an orthopedist, likewise checked petitioner prior to both hearings and found a restriction of motions in the right arm and some flattening of the shoulder girdle, neither of which conditions had been present at the first examination. He was of the opinion that orthopedically there was an additional disability of 7 1/2% of total and he opined, "I believe that this petitioner would find great difficulty in obtaining employment."
 Dr. Phillip Wilner (for petitioner), an orthopedist, whose single examination was on October 13, 1959, testified that petitioner, following hand surgery, was suffering from atrophic changes of the right shoulder-girdle musculature due to secondary adhesive capsulitis. This, in his opinion, was caused by the disuse of the injured hand and the arm, and constituted 12 1/2% of total disability.
*465  Dr. Samuel K. Pollock (for petitioner), a neuro-psychiatrist, made a diagnosis on October 5, 1959 expressed as "traumatic anxiety hysterical reaction with depression." He reported a permanent neurological disability of 25% of partial total but stated that petitioner "probably would be unable to compete in the labor market at all," adding "in my opinion, he is 100 per cent disabled."
 Dr. S. Wolfe Emmer (for respondent), a specialist in industrial medicine and surgery, treated petitioner for approximately four months in 1954 and last examined him on May 13, 1960. His proffered evidence was that petitioner had 100% total disability of the hand but no disability in the arm or shoulder resulting from the accident in question; there was a "wonderful probability" that this man could be rehabilitated; and that he was not 100% disabled. He admitted, however, that an examination of the shoulder had not been made.
 Dr. Howard Medinets (for respondent), a physician and neurosurgeon, examined petitioner in 1954 and 1960, and as to his last findings testified: "The only thing which this man had in addition to 100 per cent of the hand, is some mild anxiety which represents two and one-half per cent and which really doesn't keep him from working," and that he could conceive of petitioner's getting "some job."
Respondent's assertion that Dr. Pollock was not competent to testify respecting an increase in petitioner's disability because he had not seen petitioner at the time of the original injury lacks merit. The proofs before us evidence a requisite comparison within the principles enunciated in Yeomans v. Jersey City, 27 N.J. 496 (1958). Similarly meritless is the ratiocination that an award of 100% disablement is ipso facto excessive where a majority of the medical witnesses estimated that petitioner's incapacity was not in excess of 25% of total. The judiciary is not bound by the conclusional opinions of any one or more, or all of the medical experts. The quantum of an employee's disability is not determinable according to any precise formula, *466 mathematical rule or scientific admeasurement. Medical testimony is not conclusive. Everhart v. Newark Cleaning & Dyeing Co., 120 N.J.L. 474, 476 (Sup. Ct. 1938). The question in a case involving disfigurement is one "peculiarly for the experienced judgment of the determinator of the facts, who is of necessity guided largely by his own observation * * *." Ibid. Numerous cases have illustrated instances where work-connected disability, total and permanent in character, as contemplated by the Workmen's Compensation Act may exist notwithstanding some residual physical capacity for light or intermittent employment. See Kalson v. Star Electric Motor Company, 15 N.J. Super. 565 (Cty. Ct. 1951), affirmed 21 N.J. Super. 15 (App. Div. 1952), and the authorities therein cited (15 N.J. Super., at page 573); cf. Simon v. R.H.H. Steel Laundry, Inc., 25 N.J. Super. 50 (Cty. Ct. 1953), affirmed 26 N.J. Super. 598 (App. Div. 1953).
The factual and legal issues presented in Rodriguez v. Michael A. Scatuorchio, Inc., 42 N.J. Super. 341, 352 (App. Div. 1956), certif. denied 23 N.J. 140 (1957), are significantly parallel with and applicable to the case presently under review. There, the claimant was a non-English speaking Puerto Rican, of limited intelligence, who had lost an arm in the course of his employment as a garbage collector. In writing the opinion for this court Judge Goldmann commented:
"Considered in the light of the liberal construction which the Workmen's Compensation Act should receive, total disability is not to be interpreted literally as utter and abject helplessness. The rule which should guide us has been well stated in Lee v. Minneapolis Street Ry. Co., 230 Minn. 315, 320, 41 N.W.2d 433, 436 (Sup. Ct. 1950):
`An employee who is so injured that he can perform no services other than those which are so limited in quality, dependability, or quantity that a reasonably stable market for them does not exist, may well be classified as totally disabled.'
Cf. National Fuel Co. v. Arnold, 121 Colo. 220, 214 P.2d 784 (Sup. Ct. 1950); Texas Indemnity Insurance Co. v. Bonner, 228 S.W.2d 348 (Tex. Civ. App. 1950); Dietz v. State, 157 Neb. 324, 59 N.W.2d 587 (Sup. Ct. 1953). And see Larson, op. cit., § 57.51, pp. 27-28, *467 noting that the test quoted from the Minnesota opinion and applied in the cited cases is essentially the same as the so-called `odd lot' doctrine, a term used to refer to workers who, while not altogether incapacitated for work, are so handicapped that they will not be employed regularly in any well-known branch of the labor market, the essence of the test being `the probable dependability with which claimant can sell his services in a competitive labor market, undistorted by such factors as business booms, sympathy of a particular employer or friends, temporary good luck, or the superhuman efforts of the claimant to rise above his crippling handicaps.'"
Rodriguez was recently cited by our Supreme Court in Quiles v. N.J. Metals Co., 37 N.J. 91, 101 (1962), wherein it was iterated that the inability to secure work, if causally connected to the injury, may be as important a factor as the inability to work. Note also 2 Larson, Workmen's Compensation Law (1961), sec. 57.61, p. 30. Respondent here urges, in substance, that the record lacks factual and medical persuasiveness as to Lightner's inability to work or to obtain employment. The evidence, however, abundantly demonstrates that, as a unit of labor, he is embraced within the test and application of the "odd lot" doctrine mentioned in the Larson text and the Minnesota opinion referred to in the afore-quoted excerpt from our decision in Rodriguez.
The origin of the "odd lot" doctrine is traceable to the pronouncement of Fletcher Moulton, L.J., in Cardiff Corporation v. Hall, 1 K.B. 1009, 1020 (C.A. 1911), which dealt with a disability claim under the English Workmen's Compensation Act of 1906. The Lord Justice, after recognizing the absence of any general principle true in all cases, said:
"But on the other hand I am also of the opinion that there are cases in which the onus of shewing that suitable work can in fact be obtained does fall upon the employer who claims that the incapacity of the workman is only partial. If the accident has left the workman so injured that he is incapable of becoming an ordinary workman of average capacity in any well-known branch of the labour market  if in other words the capacities for work left to him fit him only for special uses and do not, so to speak, make his powers of labour a merchantable article in some of the well-known lines of the labour market, I think it is incumbent on the employer to shew that such special employment can in fact be obtained by him. If I might be *468 allowed to use such an undignified phrase I should say that if the accident leaves the workman's labour in the position of an `odd lot' in the labour market, the employer must shew that a customer can be found who will take it."
This English decisional rule of evidence has been followed by several American authorities, notably Transport Indemnity Co. v. Industrial Accident Comm'n., 157 Cal. App.2d 542, 321 P.2d 21 (D. Ct. App. 1958); Unora v. Glen Alden Coal Co., 377 Pa. 7, 104 A.2d 104 (Sup. Ct. 1954); Lunsford v. A.C. Lawrence Leather Co., 189 Tenn. 293, 225 S.W.2d 66 (Sup. Ct. 1949); Meyers v. Industrial Accident Comm'n., 39 Cal. App.2d 665, 103 P.2d 1025 (D. Ct. App. 1940); Jones v. Hazel Brook Coal Co., 119 Pa. Super. 409, 179 A. 783 (Super. Ct. 1935); all of which, in like tenor, have recognized the responsibility of the employer, who claims that a compensable "odd lot" employee is less than 100% disabled, to come forward with proof that work within the capacity of such an employee is, in fact, within reach.
The rationale of the rule is founded in logic and is eminently fair to the employer and employee alike, and significantly so in cases where the intellectual capacity and experiences of the employee are limited and where his injured condition involves crippling debilities and neurotic involvements. Assuredly, if a labor market offers employment to such a claimant, the normal facilities for the ascertainment of that fact would be more readily available to an employer of labor than to an individual employee. Without a reasonable prospect of selling his services, an injured employee has no material earning capacity, and is substantially helpless as a self-sustaining member of society. We here pause, however, to emphasize that where employability is established, the judiciary will scrupulously avoid sanctioning or rewarding any type of malingering, social leeching, or voluntary withdrawal from an existing market.
The petitioner is only required to prove the essentials of his claim by a preponderance of the probabilities. Ciuba *469 v. Irvington Varnish & Insulator Co., 27 N.J. 127, 138 (1958). The burden of proof to justify an increased disability award is the same as that for the establishment of an award of compensation in the first instance. Travers v. Gaynor, 24 N.J. Misc. 341, 49 A.2d 309 (C.P. 1946). The specific issue respecting "employability," however, is subject to a "balanced allocation of evidentiary responsibility." See Joy v. Florence Pipe Foundry Co., 64 N.J. Super. 13, 19-20 (App. Div. 1960), certif. denied 34 N.J. 67 (1961), where an analogous application of this precept was considered in dealing with a controversy as to whether an alleged injury was "by accident." It is basic in our law that a party is obliged to introduce evidence when necessary in order to avoid a finding against him on a material issue of fact. N.J.S. 2A:84A-6; McCormick, Evidence, "`Burden of Proof' in the First Sense: The Burden of Producing Evidence," sec. 306 (1954); 100 C.J.S., Workmen's Compensation, sec. 516, p. 475.
In essence, appellant's case rests upon the resolution of the question  was there competent and preponderating evidence to support an increase in petitioner's award to 100% of total disability as determined by the Division of Workmen's Compensation and affirmed by the Essex County Court? Upon reviewing the record in its entirety, we reach an affirmative conclusion. We must take into consideration not only the medical testimony, but all of the proven facts and circumstances that relate to petitioner as a working industrial unit, including his age (61 years), background, experience, intellectual plateau, physical incapacity, disfigurement and emotional instability. Moreover, respondent failed to refute in any evidential manner the testimony supporting petitioner's alleged unemployability.
Affirmed.