QUINCY OGLESBY, PETITIONER-APPELLANT, v. AMERICAN DREDGING COMPANY, RESPONDENT-RESPONDENT.

Argued September 25, 1973—Decided April 1, 1974.

Mr. *Eugene P. Chell* argued the cause for plaintiff-appellant (*Messrs. Falciani, Cotton, Chell & Stoinski,* attorneys).

Mr. *William W. Summers* argued the cause for defendant-respondent (*Messrs. Kisselman, Deighan, Montano & Summers,* attorneys).

The opinion of the Court was delivered by

PASHMAN, J. The sole issue herein is whether petitioner, Quincy Oglesby, 40 years of age at the time of a back injury accident, conceded to have arisen in the course of and out of employment, *N. J. S. A.* 34:15–7, on May 5, 1967, qualifies as one totally permanently disabled within the meaning of the "odd-lot" doctrine to which we have given expression today in *Barbato v. Alsan Masonry & Concrete, Inc.,* 64 *N. J.* 514 (1974).

The compensation judge entirely omitted mention or consideration of this doctrine. He made findings to the effect that petitioner, by virtue of suffering a lateral herniation of the L5–S–1 intervertebral disc while manually picking up heavy stones in the course of a dredging operation for respondent, was entitled to temporary disability for 82 1/7 weeks at the rate of $80 per week, and by reason of petitioner having suffered a permanent partial disability of 50% attributable to the work-related accident, was entitled further to receive benefits for 275 weeks at $40 per week. Broken down, the permanent disability figure was apportioned 37 1/2% representing orthopedic and neurological residuals of the herniated disc at the L–5 level, and 12 1/2% representing psychiatric residuals in the nature of a post-traumatic anxiety neurosis.

Issues of jurisdiction relative to the situs of the employment contract and causal connection incident to a second

operation undergone by petitioner two years after his first operation of February 1968 for laminectomy of the L-4 disc in the left sacral lumbar region, were briefed and orally argued below by the parties. As to the jurisdictional issue, it was stipulated before us on oral argument that it was no longer part of the case. Respondent conceded that New Jersey was the situs for the work contract from which the immediate accident arose. Petitioner, while arguing at length that the second operation also stemmed from the accident and should be a factor in awarding medical expenses, a fact found contrary to this contention by both tribunals below, has elected not to raise the issue before this Court. Hence, our concern herein is solely with petitioner's permanent disability attributable to the accident and the first operation.

The Appellate Division, in an unreported *per curiam,* apparently was satisfied that it was insufficiently evidenced that total permanent disability was established "either medically or under the so-called 'odd-lot' doctrine," and cited *Quiles v. N. J. Metals Co.,* 37 *N. J.* 91 (1962) in support thereof. We granted certification, 63 *N. J.* 427 (1973).

In reversing the Appellate Division, we deem it significant to note that similar to our determination in *Barbato v. Alsan Masonry, supra,* we are not disturbing the findings of permanent disability based upon medical factors; rather, we feel that, as in *Barbato,* an incorrect application and consideration of non-medical factors, those elements involved in the "odd-lot" doctrine, were made below, and upon a proper application of these criteria, total disability would have been realized. We have carefully and historically set out the principles of the "odd-lot" doctrine in *Barbato,* decided this day. The facts in the present case, however distinguishable in some notable instances, are in need of elaboration to indicate the extent to which they portray the picture of petitioner as a total industrial unit. Petitioner represents a unit whose inherent limitations, aside from the obvious medical infirmities imposing a great burden, make it extremely unlikely that he will overcome his handicaps and secure new work.

It is against this background that one begins to analyze the why and wherefore of shifting the burden to respondent to inform petitioner that new employment is available for him.

Petitioner Quincy Oglesby was born and raised in Statesburg, Georgia, and received no education beyond attending a church school for just one month, going but one day a week. He was never enrolled at any regular public grammar school. Hence, he could neither read nor write; he was merely able to identify his name and write his signature. His work career commenced at age nine or ten when he first began picking and hoeing cotton on a farm, and obtaining resin from a tree, preparatory to the making of turpentine. Petitioner remained in this type of farm labor until age 23 when he migrated to New Jersey to find other suitable employment.

His first job in this jurisdiction was putting in a sewer line for a construction company, which involved picking up, placing and arranging heavy stones and gravel in a ditch prior to the actual laying of the sewer pipeline. This work lasted three months. Thereupon, petitioner managed to find work as a carpenter's helper at an oil refinery. He remained there one and one-half years, until the construction job was completed and the workers were laid off. This apparently was the work pattern he was to experience for the remainder of his work life. Construction employment was bountiful and although this type of work utilized unskilled laborers, such as petitioner, such workers constantly faced the reality of being laid off when their project was at an end. Petitioner worked in several types of chores in this industry, many of which were relegated to heavy manual labor. He was engaged in digging manholes and putting in pipes at a large chemical plant, and carrying bricks and blocks. At one point, in between construction jobs, he worked at an automobile assembly plant, spreading black tar on the underside of automobiles. From 1962, when the latter job opportunity terminated, until his ill-fated accident in 1967, petitioner worked as a longshoreman for various dredging companies. He first

began working for respondent in September 1965. Throughout this period, his work revolved about pipes used to blow the silt upwards from the river beds, as well as the actual removing and placing of heavy bed rocks. He never received any formal apprenticeship or training in any trade.

Prior to the 1967 injury, petitioner had been involved in two other industrial accidents, both of which occurred while he was employed for various dredging companies. He was affected with a back sprain while pulling a chain bar and inserting a pipe in 1962; and in 1965 he received a blow to the head while changing valves when a wheel was thrown free, pinning petitioner against a rock. This occurred while in the employ of respondent, at a previous and unrelated work project. Other than these two incidents, petitioner had no other work accidents, nor had he suffered any major sicknesses or operations.

On the eventful day of May 5, 1967, as petitioner was engaged in moving rocks onto a canal being dredged, while picking up one large 150-pound stone by hand, he testified that he "got a sharp pain, right here in my back, lower part of my back," which pain radiated into the left leg. He managed to complete his workload for that day, although he did not further bend to pick up any rocks, and, leaving the job site early, went home and visited with his regular physician. He reported for work the next day and advised the foreman that he was experiencing back pains. He was permitted to do only light work with the bulldozer that day. He has not returned to work since.

Petitioner visited the doctor that day as well as every other day for approximately a week and a half thereafter. He then became involved with a host of doctors, a process that has seemingly not yet ended. He was referred to two Camden doctors, Drs. Kain and McCray, one of whom immediately placed petitioner in the local Cooper Hospital, where petitioner was subjected to extensive muscle relaxant and physical therapy treatments. In August, while in the care of a Dr. Adams, a neurosurgeon who first met petitioner while the

latter was in the hospital, the petitioner was fitted with a Knight brace and shoulder straps. Petitioner continued under the medical care of Dr. Adams and a Dr. Leonburg, on an out-patient basis, until February 1968, when he once again was admitted to Cooper Hospital.

While under the out-patient care of Dr. Adams in autumn of 1967, a myelogram taken on June 12, 1967 of petitioner's lower back came under the scrutiny of Dr. Harold W. Rushton, specialist in neurologic surgery and partner of Dr. Adams. Dr. Rushton analyzed the myelogram as revealing a small lateral herniation of the L5–S–1 intervertebral disc on the left side and dorsal protrusion of the L3–L4 interspace; in his estimation this was due to degenerative disc disease. His opinion was not shared by petitioner's medical experts and was a subject of much contention at the trial. Dr. Rushton advised surgery. The operation performed on February 15, 1968 was for the purpose of removing degenerated nuclear material which was decompressing the nerve root and, hence, to relieve the pressure. After petitioner's hospital discharge on March 3, 1968, he continued to see Dr. Rushton, but at all times complained of incapacitating and unrelenting pain. Since a further examination did not reveal the nuclear material previously evident, Dr. Rushton could find nothing wrong with petitioner. He treated him nevertheless with rest and medication, but by August 1968, when he felt there was nothing additional he could do, he referred petitioner to Dr. Matthew Mischinski, an orthopedic specialist. Although petitioner remained in almost constant pain, he ceased his visits to Dr. Mischinski, and received medical attention but once in 1969. He resought medical advice on January 10, 1970, when he consulted Dr. Robert A. Groff, a neurological specialist.

Throughout this time, petitioner's back difficulty persisted. The pain was at times severe in his left leg, his motion was limited, and his sleeping often restless. Unemployed, he would take short walks and short drives into town to pick up his social security and temporary disability checks. He could

no longer fish or swim and remained largely idle, passing his time by watching television. After the discharge from the hospital in 1968, he had been referred to a rehabilitation center in Salem. From June through September of 1968, petitioner reported there as often as his physical strength would allow. He worked by placing small toys on cardboard backers by means of a staple, but he could not put in more than three hours in a six-hour day. He became restless and walked around a bit; for if he sat too long, he would experience a drawing sensation in his legs. He soon abandoned this project for the aforementioned reasons. He received no other rehabilitative training.

Dr. Groff, who first saw petitioner on October 30, 1967, examined the latter in January 1970 and diagnosed his condition as a severe irritation of the nerve root in the lumbar spinal canal, muscle spasm, and loss of normal curve to the back. An operation was thereupon performed on the left L–4 interspace, ostensibly to remove a bulge on the herniated disc which caused irritation and pressure on the nerve root. Petitioner was discharged from the hospital on March 15, 1970, and continued in Dr. Groff's care until September 8, 1970, whereupon, according to Dr. Groff's testimony, no change in symptoms was evidenced. Petitioner persisted with pain in both legs, sustained a drawing sensation in the left leg and endured mild lumbar muscle spasms which limited appreciably his back movements.

Up to the time of the trial, which transpired over four separate dates in the spring of 1971, petitioner saw no other doctors, except at respondent's behest for purposes of trial preparation.

Petitioner's wife, Mrs. Gertrude Oglesby, testified on April 21, 1971. She revealed that since the accident, her husband had undergone a personality change. He appears nervous, ill-tempered and becomes easily upset. He smokes more, is intolerant to children's noise — a manifestation previously absent — is moody and depressed, sleeps and eats little, and has lost weight. Mrs. Oglesby added that her husband can

no longer perform accustomed chores and odd jobs around the house which were once common activities. Furthermore, he is greatly concerned that since he stopped working and his income has diminished, he will be unable to send the two eldest children to college.

The consensus of the medical experts testifying at the workmen's compensation hearing was that petitioner could not, under any circumstances, return to his accustomed role as a longshoreman or heavy manual laborer. Disagreement among the doctors arose as to their divergent estimates of the percentage of total disability.

Dr. Robert A. Groff, testifying for petitioner, doubted that petitioner will ever improve so as to become economically useful. He suggested putting petitioner in a rehabilitation center for a month and observing the severity of his symptoms to gauge whether rehabilitation would foster new employment opportunities. Otherwise, he considered petitioner 100% disabled, and absent the remote possibility of success of rehabilitation, did not think petitioner capable of running an elevator or delivering newspapers, employment possibilities suggested by respondent on cross-examination.

Dr. Leopold David, an orthopedic specialist with expertise in industrial medicine and traumatic cases, examined petitioner on two different occasions: December 2, 1968 and November 25, 1970. On both visits, Dr. David reported, petitioner complained of great pain in the lumbrosacral and sacroiliac regions, pains and sensations radiating over the buttocks, thighs and legs. Based on the 1968 examination, Dr. David conceived medical disability to be 50%, and in light of the 1970 examination, 65%. Dr. David did not place too much reliance on these percentages for, as he reasoned, a man who has had two discs removed, would hardly be likely to get past a doctor in a pre-employment physical examination. Dr. David was constrained to agree that after the 1968 examination, petitioner exhibited symptoms of psychiatric or emotional behavior. But when a person, such as petitioner, is in pain for a certain length of

time, and there does not seem any end to the suffering in sight, when he cannot return to work, or do accustomed and routine chores, he becomes more and more depressed. In such cases, the emotional reaction might be independent of the physical. Two surgical procedures undoubtedly would contribute to an emotional trauma, especially when they accomplished little good, and did not consequentially alleviate the pain. These factors, when combined with the medical findings, rendered petitioner virtually unemployable in Dr. David's opinion. It was possible, Dr. David intimated, that petitioner could handle some sort of light sedentary type of work.

Dr. Aaron W. Mallin, a Pennsylvania licensed specialist in psychiatry and electroencephalography, saw petitioner on December 14, 1970 and gave him a psychiatric examination. He diagnosed a post-traumatic psychoneurosis from nerve root damage with only slight improvement from the several operations. He opined that petitioner's condition would not improve, and hence, that he was totally disabled. With a limited education and lack of skills, petitioner was unsuitable for any type of laboring or semi-laboring, nor was he proficiently accomplished to do a quiet, peaceful job. His psychoneurosis is compounded by his inability to work, which, in itself, is quite disabling. Hence, adding a 65% medical disability to a 50% disability from psychological and other factors, essentially those of petitioner's frustration and discouragement in not seeing any improvement, as well as age and education, added up to over 100% total disability.

Testifying for respondent, were Drs. Harold W. Rushton, Joseph Robinson, and William P. Sims. Dr. Rushton, who performed the first operation but who had not examined petitioner since September 23, 1968 when he referred the latter to another specialist, ascertained that petitioner was capable of doing light work, and that the pain petitioner was experiencing would subside.

Dr. Robinson, a specialist in psychiatry and neurology, examined petitioner at respondent's request on January 14,

1971. Dr. Robinson concluded, based on an extensive question and answer session, that petitioner was not unduly nervous nor manifested depressive symptoms. Nor did Dr. Robinson think petitioner suffered any causally related psychiatric disability. It was normal for an injured workingman to show a general concern about his back and to evidence some tenseness. Hence, Dr. Robinson estimated a zero percent neurological disability and a 5% psychiatric disability. Even considering some general depression brought on when petitioner views other men working, Dr. Robinson would ascribe only a 0-10% disability. As for the anxiety, Dr. Robinson diagnosed petitioner to have a chronic condition, one not related necessarily to the work-connected injury. On cross-examination, Dr. Robinson minimized a person's stress normally associated with a medical operation and a correlative lack of improvement. He admitted, however, the viability of age, background and training as factors which conceivably might contribute to petitioner's stress.

The last witness to testify, Dr. William P. Sims, a specialist in industrial medicine, examined petitioner at respondent's request on November 16, 1970. He opined a 25% partial total disability predicated largely on petitioner's subjective complaints which Dr. Sims found inconsistent, and a non-finding of muscle spasms in the lumbar-sacral area. While he agreed that petitioner could not return to longshoreman work, he did not think him totally unemployable. Dr. Sims, who indicated that he often did pre-employment physicals, suggested that petitioner might be qualified to do maintenance or assembly line work, provided he could stand on his feet for some prolonged time. With a patient like petitioner, Dr. Sims offered, you have to push him a little.

From the foregoing, we are satisfied that petitioner is one falling within the "odd-lot" of the labor market. Petitioner's medical experts have presented a total picture of Oglesby which we are inclined to find credible based on the foregoing recitation of the evidence. He indeed qualifies as one totally

disabled by reason of such factors as physical condition, age, education, training, background, post-accidental neurological and emotional condition and the great unlikelihood of his finding new employment, absent a charitable employer. See *Kalson v. Star Elec. Motor Co.*, 15 *N. J. Super.* 565 (Cty. Ct. 1951), aff'd 21 *N. J. Super.* 15 (App. Div. 1952).

For the reasons and authorities elucidated today in *Barbato v. Alsan Masonry & Concrete, Inc.*, 64 *N. J.* 514 (1974), we reverse the judgment of the Appellate Division and remand the matter for a supplementary hearing to afford the respondent an opportunity to meet its burden of proof that some kind of work, within the abilities of this petitioner as an industrial unit, is available to him. Failing to meet this burden, the Judge of Compensation shall award to the petitioner the benefits of total disability.

HALL and CLIFFORD, JJ., concur in result.

*For reversal and remandment*—Justices JACOBS, HALL, SULLIVAN, PASHMAN and CLIFFORD—5.

*For affirmance*—None.