LOUIS BARBATO, PETITIONER-APPELLANT, v. ALSAN MASONRY & CONCRETE, INC., RESPONDENT-RESPON-DENT.

Argued November 20, 1973—Decided April 1, 1974.

516

*Mr. Charles J. Farley, Jr.* argued the cause for petitioner-appellant (*Messrs. Farley & Farley,* attorneys; *Mr. Charles J. Farley, Jr.,* on the brief).

*Mr. George J. Kenny* argued the cause for respondent-respondent (*Messrs. Hughes, McElroy, Connell, Foley &*

*Geiser,* attorneys; *Mr. George J. Kenny,* of counsel and on the brief).

The judgment of the Court was delivered in an opinion by PASHMAN, J. Petitioner suffered a work-related myocardial infarction on February 24, 1970 and shortly thereafter filed a workmen's compensation claim for total disability. Compensation was acknowledged at the workmen's compensation hearing but only 33 1/3% of partial total was awarded by the compensation judge. An appeal to the Morris County Court for a *de novo* review followed. After careful consideration, findings were made similar to the judgment entered in the Division of Workmen's Compensation. Petitioner subsequently appealed to the Appellate Division which affirmed the County Court in an unreported *per curiam* opinion, holding on the basis of *Close v. Kordulak Bros.,* 44 *N. J.* 589 (1965), that the findings that petitioner was not really unemployable were adequately supported by the record. We granted certification. 63 *N. J.* 550 (1973). We reverse.

Louis Barbato, 60 years old at the time of the accident, lived all his life in Madison, New Jersey. While manually jacking up a scaffolding unit, he felt pains in his chest. After a lunch break, he resumed work but during the course of the afternoon, petitioner's pains increased to the point where he left his work, drove himself home, summoned his doctor and was in turn taken to the hospital where he stayed one month under treatment for a myocardial infarction. He has been under the medical attention of Dr. Donald Kent, a general practitioner who is petitioner's family doctor. He stated at the trial that he had been treating petitioner since 1948. In 1962, he treated petitioner for a coronary, and since for high blood pressure and diabetes. Petitioner testified that after his 1962 heart attack, he had attempted to find less rigorous employment, but being unsuccessful, he had eventually returned to work as a laborer. Since the present heart attack, Dr. Kent prescribed various medications,

digitalis and esidrix, for petitioner's blood pressure and orinase for his diabetes.

Petitioner visited him on a regular monthly basis. The doctor stated that petitioner's cardiac condition was moderately severe. He indicated that a patient on digitalis certainly has to be watched, the blood pressure must be monitored, and the blood sugar regulated. Dr. Kent summarized that this condition would remain with petitioner for the duration of his life. He was of the firm opinion that petitioner could not return to his work as a laborer.

Dr. Rowland Goodman, petitioner's medical expert, testified that he had examined Barbato on August 5, 1970, and reviewed the hospital record which diagnosed petitioner's condition as "acute myocardial infarction due to arteriosclerotic heart disease." This meant that there was a narrowing of the aortic valve which produced a murmur, causing the heart to beat more vigorously to push the blood through the narrowed vessels. There was a possible presence of kidney disease diabetes; the electrocardiogram showed premature ventricular beats and a healed anterior wall myocardial infarction and persistent elevation of the ST segment in leads V–2 through 3. Based on his own evaluation, Dr. Goodman found petitioner to be suffering from an arteriosclerotic heart disease with an enlarged heart, aortic stenosis and severe residuals of the acute myocardial infarction.

Dr. Goodman added that based on petitioner's subjective complaints to him of his sleeeping discomfiture, a congestive heart failure was indicated and the heart was not pumping adequately. Accordingly, he felt the patient had made a poor recovery, that his disability was 100% of total, and as a result would never be able to return to employment. On cross-examination, however, Dr. Goodman's diagnosis of the congestive heart failure was somewhat disproven. The hospital record did not indicate any of the symptoms normally associated with congestive cardiac failure.

Dr. Sanford Lewis, a specialist in internal medicine and cardiac diseases, examined petitioner on November 25, 1970, on behalf of respondent. Dr. Lewis took a normal laboratory cardiac examination of petitioner as well as an electrocardiogram. His diagnosis was that petitioner's aorta had widened, which resulted in a mild increase to the left ventricular cardiac segment. He disputed Dr. Goodman's analysis of orthopnea — difficulty in breathing while lying down. He said that it was normal for a post-cardiac patient to experience some dyspnea — shortness of breath, and occasional chest pains by exerting oneself too much too soon. Nevertheless, petitioner did walk 1.5 miles a day, and in Dr. Lewis' evaluation, based on criteria of the American Heart Association's skill of disability evaluation, this indicated, in his estimation, that petitioner had suffered only a 20% cardiac disability. He said, furthermore, that there was no significant complication such as arrhythmia, gross cardiac enlargement, congestive heart failure, or aneurysm formation. Dr. Lewis believed that the injured portion of the heart muscle is replaced by fibrous scar tissue which heals the infirmity. In this case, since no swellings developed in the heart nor was any symptom of heart failure evidenced while petitioner was in the hospital, he found there was no need for digitalis, i. e., that there was no rhythm problem with the heart. Nor, in his analysis, did he ascertain any fluid in the lungs, which would result in orthopnea. In Dr. Lewis' opinion, petitioner suffered only from arteriosclerotic and hypertensive heart disease with a previous myocardial infarction. Dr. Lewis conceded that it would be extremely improbable that petitioner could resume employment as a construction laborer, but he believed petitioner quite capable of performing some sort of gainful employment. He suggested that petitioner could work as a guard, sales clerk, or at an assembly bench in a factory. He was quite certain that petitioner could pass a pre-employment physical.

Dr. Goodman took the other extreme and indicated that he doubted whether petitioner could do any type of work.

Taking a middle position, Dr. Kent suggested petitioner might do some desk work, pencil and paper work, but definitely not hard, physical labor. In fact, Dr. Kent tried, unsuccessfully, to get petitioner to change his employment some time before 1970 due to petitioner's diabetes which Dr. Kent diagnosed in 1968. Dr. Kent warned, however, that in his estimation, petitioner quite often became short of breath. He thought this would inhibit his ability to stay in any gainful employment.

Petitioner's education did not go beyond the 5th grade, and his employment background consisted of landscaping, general laboring and factory work, all involving more or less heavy manual labor. He possessed no general skills. His intellectual capacity was somewhat limited, and although he could read some English, he had definite difficulty reading and writing. He owned his own home in Madison, collected $25 a month as a labor pension, $180 a month from Social Security, and had two adult children living with him, each of whom contributed to the support of the household. Since a partial recovery, petitioner made no effort to secure work, for, as he testified at trial, Dr. Kent told him that he could not work and should remain idle. Petitioner testified that he walks daily and at one point painted the walls and ceiling of a 12 x 14 room. He testified that he had to stop intermittently to rest, but could paint a wall for an hour at a time, and the ceiling for 15 or 20 minutes without a rest. After doing this, he required two days of bed rest.

Carl F. Nawoj, an assistant professor of Industrial Relations at Rider College and part owner of a personnel service agency who had interviewed Barbato at the request of his counsel, testified for petitioner. Because he found that petitioner lacked command of the English language, required help in filling out his employment application, and had a physical problem with his heart, it was Nawoj's evaluation that it would be extremely unlikely, if not impossible, for petitioner to secure new employment. Considering the high rate of unemployment, petitioner's age, background and his

work potential, Nawoj, drawing upon his expertise, concluded that there was no place for Barbato on a permanent type job for a particular company anywhere. Nawoj's professional judgment — that there would be no sedentary work for petitioner — was based on the reality that employers are insurance-minded and are reluctant to employ someone with petitioner's history, background and age.

The judge of compensation had difficulty conceptualizing how a person with a 100% disability could paint steadily for an hour. He reasoned that in light of all the medical testimony and from his impression of petitioner's testimonial candor, demeanor and behavior, there was unnecessary bridling and belligerency which did not inspire a feeling of total candor. He minimized Dr. Goodman's finding of 100% disability as not based on subjective complaints. He found that there were no symptoms of any congestive heart failure, nor that, medically speaking, petitioner's disability was total.

As to the "odd-lot" doctrine which defines disability by factors other than purely medical ones, the compensation judge pointed out that petitioner had not looked for work, had not attempted to do so, nor sought the aid of any employment agency. Nawoj's testimony was discounted because his expertise was restricted to the Trenton area, whereas petitioner resided in Madison where job opportunities may have realistically existed. The compensation judge carefully distinguished the case of *Rodriguez v. Michael A. Scatuorchio, Inc.*, 42 *N. J. Super.* 341 (App. Div. 1956), certif. den. 23 *N. J.* 140 (1957) as to petitioner's age, language, neurological conditions, motivation and education. He noted that petitioner owned his own home, had other sources of income and seemed quite content to spend his remaining days in idleness; therefore he did not apply the "odd-lot" doctrine set forth in *Rodriguez* and other cases. See *infra*. Apparently crucial to the determination of the compensation judge was the relation of petitioner's age to his asserted unemployability. The Judge said: "When age is the most

significant factor in one's inability to obtain employment, then that individual is not entitled to total disability benefits under the Workmen's Compensation Act . . ." The Judge continued that the compensation act was not "intended to be a pension or retirement plan for older but no longer employed workers." The compensation judge concluded by finding petitioner to be 33 1/3% partial totally disabled.

The County Court Judge deferred considerably to the Compensation Judge in the latter's assessment of the witness' credibility and in petitioner's failure to support objectively the existence of symptoms otherwise indicating congestive heart failure. He agreed substantially with the findings, that medically speaking, the infarction was reasonably healed and that 33 1/3% was a fair quantum in measuring petitioner's disability. He further concluded that petitioner did not come within the "odd-lot" category and that he was not unemployable. Having reasoned that the purpose behind workmen's compensation was to impose on industry the responsibility of caring for its disabled employees where the accident caused the disability, citing *King v. Western Electric Co.*, 122 *N. J. L.* 442 (Sup. Ct. 1939), he found that no causal relationship was present between the injury and the inability to secure employment, nor that the evidence established a degree of obvious physical impairment coupled with the factors of training and age such that it places the claimant *prima facie* in the "odd-lot" category.

## I

 Petitioner has raised two issues. The first is whether there was substantial evidence in the record which would justify the denial of a total disability award based solely on medical factors. The second, were the courts below in error by failing to properly apply the "odd-lot" doctrine and hence consider factors other than medical? Petitioner has maintained that at his *de novo* trial, the County Court did not properly review the findings of the compensation judge.

In *Close v. Kordulak Bros., supra,* we said: "The County Court has the heavy obligation to bring a new mind to the case and conscientiously to reach its own independent determination." 44 *N. J.* at 598. This duty includes a weighing of the evidence and a statement of its reasoned conclusions even though a trial *de novo* is based on the record before the Division of Compensation. *MacDonald v. Hudson Bus Transportation, Inc.,* 100 *N. J. Super.* 103 (App. Div. 1968). Where, however, witness' credibility is concerned and particular findings by the compensation judge have been made, *Congleton v. Pura-Tex Stone Corp.,* 53 *N. J. Super.* 282 (App. Div. 1958), the County Court should consider, although not bound by, the evaluation of that credibility finding by the compensation judge who saw the witness' expression, heard his tone of voice and observed his demeanor. *MacDonald v. Hudson Bus Transportation, Inc., supra,* 100 *N. J.* at 106. We note that the compensation judge did carefully particularize his observations as to the witness' lack of credibility and, further, his reasons for rejecting certain medical and other expert testimony, as well as that of the petitioner. Specifically, he rejected Dr. Goodman's diagnosis of 100% medical disability for reasons that the conclusion derived more from subjective rather than objective medical symptoms and that petitioner's post-injury behavior did not manifest a totally disabled cardiac recuperative. The County Court Judge, who agreed with the compensation judge's findings, apparently was quite satisfied.

██ The scope of our review of workmen's compensation factual findings where a *de novo* trial was had, was recently stated in *White v. Atlantic City Press,* 64 *N. J.* 128 (1973). We there said that we give great weight to the fact-finder whose decision was reached on sufficient credible evidence. No plain error is alleged, nor that the compensation judge was unreasonable in such a finding. We see no reason to disturb these findings. Solely measured in terms of objective medical criteria, petitioner did not suffer 100% disability.

## II

■ We think petitioner's second contention has merit. In failing to give petitioner the benefit of the "odd-lot" doctrine, the compensation judge was in error. The record compels an award of total disability upon the basis of non-medical factors recognized by the law here and elsewhere.

In *Zanchi v. S & K Const. Co.*, 124 *N. J. Super.* 405 (Cty. Ct. 1971) aff'd on the opinion below 63 *N. J.* 331 (1973), the facts paralleled closely those in the instant case. A myocardial infarction felled a 60 year old construction laborer. Zanchi, as Barbato, claimed total unemployability both for medical and other reasons. He was still seeing a doctor every two weeks at the time of trial (16 months after the attack). Though American born, Zanchi lived a good portion of his life in Italy. He speaks and reads very little English. Judge Wood said: "he is, to all intents and purposes, functionally illiterate. His educational training is meager, and his employment record indicates only highly strenuous labor of the unskilled variety." 124 *N. J. Super.* at 413. Judge Wood was confronted with this issue which we answered in the affirmative: "on the basis of other evidence and its own common knowledge, whether circumstances unrelated to the accident in question, coupled with the disability arising from the accident, rendered petitioner unemployable." (*Zanchi, supra,* at 410). The courts below minimized too greatly these "other circumstances and factors" in deciding petitioner's non-qualification for total benefits. They found petitioner employable despite "due regard for his age, overall physical condition, and the labor market." Our analysis of these criteria conclusively determines that petitioner was indeed unemployable within the "odd-lot" doctrine.

The odd-lot doctrine was first expounded in *Cardiff Corporation v. Hall*, 1 *K. B.* 1009 (1911). In that English case, an employee unable to resume his occupation as a driver because of a work-connected injury applied, without success,

for various forms of light work. The prevailing Spencerian philosophy found expression in the judicial pronouncement that the employer does not guarantee the state of the labor market nor that a workman is entitled to compensation for unemployment due to the fluctuations of the trade. This view was predicated on the theory that if the employee has full capacity, it is his own responsibility to fend in the labor market. The employer is discharged of his responsibility once he compensates for the employee's injury, either in *specie* or in kind. Nevertheless, Lord Judge Moulton noted that not in all cases is the injured employee capable of looking out for himself in obtaining other employment:

There are cases in which the onus of showing that suitable work can in fact be obtained does fall upon the employer who claims that the incapacity of the workman is only partial. If the accident has left the workman so injured that he is incapable of becoming an ordinary workman of average capacity in any well known branch of the labor market — if in other words the capacities for work left to him fit him only for special uses and do not, so to speak, make his powers of labour a merchantable article in some of the well known lines of the labour market, I think it is incumbent upon the employer to shew that such special employment can in fact be obtained by him. If I might be allowed to use such an undignified phrase, I should say that if the accident leaves the workman's labour in the position of an "odd-lot" in the labour market, the employer must shew that a customer can be found who will take it . . ." *Cardiff Corporation v. Hall, supra*, at 1020–1021.

The point of inquiry was whether the accident had produced in the workman some incapacity for work over and beyond his physical disability, personal to himself, which prevented his obtaining employment, such that the employer's obligation extended to compensation beyond the immediate medical injury. Most courts in this country, however, were then rather slow in adopting this novel approach. This jurisdiction, in fact, only enacted our Workmen's Compensation Act in the year of the *Cardiff* decision, L. 1911, c. 95, and in the formative years, application of the laws was strictly construed. See, *e. g., Splitdorf Electrical Co. v. King,* 90 *N. J. L.*

421 (Sup. Ct. 1917), aff'd 92 *N. J. L.* 524 (E. & A. 1918). Mr. Justice, then Judge, Cardozo, manifested his profound concern for the hobbled and helpless worker when he so eloquently expressed this reality:

> He [the plaintiff] was an unskilled or common laborer. He coupled his request for employment with notice that the labor must be light. The applicant imposing such conditions is quickly put aside for more versatile competitors. Business has little patience with the suitor for ease and favor. He is the "odd lot" man, the "nondescript in the labor market". Work, if he gets it, is likely to be casual and intermittent . . . Rebuff, if suffered, might reasonably be ascribed to the narrow opportunities that await the sick and halt.

*Jordan v. Decorative Co.,* 230 *N. Y.* 522, 525, 130 *N. E.* 634, 635–636 (1921).

Justice Francis (then Judge Francis) recognized the effect of the unstable market in fostering total disability in *Kalson v. Star Elec. Motor Co.,* 15 *N. J. Super.* 565 (Cty. Ct. 1951), aff'd 21 *N. J. Super.* 15 (App. Div. 1952). A 66-year old worker suffered a compensable knee injury necessitating his getting around with a crutch and cane, and he subsequently petitioned for additional compensation. Evidence was elicited that the leg appearance would interfere with the saleability of whatever labor petitioner offered to an employer, if indeed such a petitioner could pass a pre-employment physical. Not unless the person to whom he was applying for employment had a charitable inclination, would petitioner be given a job. Judge Francis, citing an earlier decision by Justice Heher in *Everhart v. Newark Cleaning & Dyeing Co.,* 120 *N. J. L.* 474 (Sup. Ct. 1938), said that "[T]he claimant's injuries and their consequences must be viewed as a whole. He is to all intents and purposes unemployable . . . His physical infirmities and deficiencies consequent upon the industrial accident render his labor unsaleable to any market accessible to him." Compensable disability became defined under the Act as the "loss ensuing from personal injury which detracts from the former efficiency of the workman's body or its members in the ordinary pursuits of life in rela-

tion to the field of service to which he is suited." (15 *N. J. Super.* at 573). Thus, to one accustomed to heavy manual labor, disability was found where only intermittent or sedentary work was available. *Jersey City Printing Co. v. Klochansky*, 8 *N. J. Super.* 186 (App. Div. 1950); *Cleland v. Verona Radio Co.*, 130 *N. J. L.* 588 (Sup. Ct. 1943).

The "odd-lot" doctrine which viewed the worker in the perspective of the competitive market place was given judicial solidification by Judge Goldmann in *Rodriguez v. Michael A. Scatuorchio, Inc.*, 42 *N. J. Super.* 341 (App. Div. 1956), certif. den. 23 *N. J.* 140 (1957). Rodriguez was a 43-year-old garbage and refuse collector who, while emptying a can of garbage into the back of his employer's truck equipped with a power driven rotator, slipped, and caught his hand in the grinding mechanism, necessitating amputation of his arm six inches below the shoulder joint. Rodriguez, a native of Puerto Rico with limited knowledge of the English language, dropped out of school at 15, never going beyond the third grade. Prior to becoming a garbage collector, he worked as a migrant farmer, blacksmith and carpenter's helper, as well as other industrial pursuits. He was married and had four children, was hard-working and well adjusted. As a result of the accident and the consequential arm surgery, and the fitting of an artificial arm of which Rodriguez could make but limited use, he became self-conscious, highly nervous and ill-adapted at what had formerly been normal activities. It became difficult for him to care for his own needs; he became socially introverted, lost his confidence, and behaved in a generally restless, unhappy and depressed manner. He could no longer maintain his equilibrium, either psychologically or medically. Rodriguez sought other employment, applying at over 40 different factories of all sorts, but at each approach, he encountered frustration and rejection. All this because of a work-related accident.

Had Rodriguez' disability been measured solely in medical terms, recovery would have been limited to the nonuse of the arm. The *Rodriguez* court recognized that the psychoneuro-

logical disability that set in, compounding each of Rodriguez' social and employment rejections, was more significant and consequential. Judge Goldmann reinstated the compensation court's judgment and applied the "odd-lot" rule in finding total disability. He took into consideration the entire picture of Rodriguez as a working unit, a unit consisting of one whose mental outlook on life generally superimposed upon his physical disability, rendering him virtually unemployable. With a limited education, and lack of non-manual work skills, Rodriguez found himself to all intents and purposes, helpless. It was for this class of workers, who found themselves in an "odd-lot" of the labor market, that the doctrine was designed. It was the inability to get work, traceable directly to the compensable injury, which was tantamount to the inability to perform work. *Larson, Law of Workmen's Compensation,* § 57.61 (1972). Aware of the worker's predicament in obtaining new employment, the *Rodriguez* court announced that once petitioner establishes *prima facie* that he is no longer an employable unit, *i. e.,* "odd-lot," he becomes entitled to total disability. *Rodriguez* commented favorably upon petitioner's post-accident work attitude and the absence of any evidence indicating that petitioner was a malingerer. Cognizance was taken that petitioner was not a superman, one expected to pick himself up totally by his own bootstraps.

██ ██ The viability of the odd-lot doctrine in this State was further evidenced in *Lightner v. Cohn,* 76 *N. J. Super.* 461 (App. Div.), certif. den. 38 *N. J.* 611 (1962). Petitioner's work-related injury required amputation of three fingers and the phalanx of the thumb, and resulted in the subsequent development of a shoulder pathology and increased neurological impairment. He experienced nervousness, sleepless nights, headaches, and encountered great difficulty upon seeking employment. It was advanced that petitioner was often faced with these kind of comments: "When I go, they look at my hand and turn around and laugh. They say, 'Man, you are crazy.'" (76 *N. J. Super.* at 463).

*Lightner* relied on *Everhart v. Newark Cleaning & Dyeing Co.,* 120 *N. J. L.* 474 (Sup. Ct. 1938) ; *Kalson v. Star Electric Motor Company, supra,* 15 *N. J. Super.* 565 (Cty. Ct. 1951), and the authorities therein cited (15 *N. J. Super.* at 573), and *Rodriguez v. Michael A. Scatuorchio, Inc. supra.* The court in *Lightner* recognized that total and permanent work-connected disability may exist notwithstanding some residual physical capacity for light or intermittent employment; further, that divergent medical conclusions only accentuate an inexactness and uncertainty in the application of medical science to humanistic problems. Judge Lewis expressed the view that the judiciary is not bound by the conclusory opinions of any or all of the medical experts, as the quantum of disability cannot be reduced to mathematical admeasurement. Other factors must be considered in looking at the whole man: intellectual capacity, employment experience, physical debilities, general background, education, psychological inhibitions, age and ability to communicate in English. Hence, where the employer contends that the employee is *less* than 100% disabled, it is incumbent upon the employer to show that work within the capacity of such an employee is, in fact, within reach. As long as the employee is not a malingerer or social leecher who voluntarily withdraws from the market, the foregoing burden shifts to the employer. (76 *N. J. Super.* 468). See also *Quiles v. N. J. Metals Co.,* 37 *N. J.* 91 (1962).[1]

*Zanchi* held that: "The court itself must decide, on the basis of other evidence and *its own common knowledge,* whether circumstances unrelated to the accident in question, coupled with the disability arising from the accident, ren-

---

[1]Pennsylvania, as early as 1932, declared that where the injured worker can perform services specially fitted to his physical condition, the burden shifts to the employer to show that such work is in fact within reach, and absent his proof, the claimant must be compensated as for total disability. See *Billante v. Stouffer's Foods, Inc.,* 7 Pa. Cmwlth. 532, 300 *A.* 2d 284, 285 (Pa. Cmwlth. 1973).

dered petitioner unemployable," (emphasis added) (124 *N. J. Super.* at 410). Upon such determination, the employer must then come forward to prove that work is within reach of the employee.

Hence total disability is a combined law and fact question. While we reiterate that we are not disputing the fact findings, we do take issue with the application of the legal criteria to the facts by the tribunals sitting below.

The compensation judge recognized the "odd-lot" doctrine as set forth in *Rodriguez* but distinguished it from the facts herein. He pointed out that petitioner had not looked for work nor sought the aid of employment agencies. He further dismissed as irrelevant the observations made by Professor Nawoj that there was no permanent-type job for a person like petitioner in the existing market place. This attests to a misunderstanding of the "odd-lot" doctrine. While *Rodriguez* and *Lightner* noted strong disapproval with the employee who malingers and voluntarily withdraws from the labor market, the pivotal feature of the "odd-lot" doctrine is its recognition that the mental status of the aged, ill-prepared and injured employee is significantly affected when for the first time in his life such a person finds himself unable to return to his accustomed work — usually as a manual laborer, as is the case in the majority of the "odd-lot" situations — and faces an imponderable uncertainty as to his financial affairs and the remainder of his work life.

The day has long since passed when we can remain indifferent to such an employee whose remaining alternative in life is to sit by idly and await arrival of his social security or pension check, feeling worthless and unavailing, knowing that he can no longer meaningfully contribute his employment. In *Kalson* and other cases, we recognized the difficulty of an aged employee, recuperating from a work-connected injury, to find employment, absent the aid of friends or a "charitable employer." We cannot ignore the simple fact that most employers will not hire a 61 year old heart attack victim when alternative younger and more attractive and ver-

satile competitors are available. Nor can we approve the pragmatic concept that hiring practices attendant to people in petitioner's status are different in Trenton, where Professor Nawoj's expertise was acknowledged, than in Madison where petitioner resides. In this modern day and age, methods of employment and employment opportunities are for the most part alike. Of course, opportunities may tend to be greater in urban rather than in suburban areas. But in the main, it is not altogether crucial. We deem it sufficient to take "judicial notice" that the Trenton area with a larger population and greater industrial output would most likely offer more and diversified employment opportunities than Madison, a relatively non-industrial, residential community. If we accept as accurate, and there appears no reason not to, Nawoj's findings. which went uncontroverted, as to the improbability, if not outright impossibility, of petitioner's finding a job in Trenton, then it is even greater an unlikelihood that petitioner would find work in Madison.[2]

---

[2]Cf. In Petrone v. Moffat Coal Company, 427 Pa. 5, 233 A. 2d 891 (Sup. Ct. 1967), Justice Musmanno in an eloquent opinion questioned:

How does the fact that a person is capable of performing light work guarantee that light work is available.

Suppose that the work the claimant is capable of performing is that of shoveling snow and he lives in Florida, or suppose he is capable of picking cotton and he lives in Maine? If the finding "capacity to perform light work" is to mean anything, there must be some evidence that light work exists. (233 A. 2d at 893).

In Army and Air Force Exchange Service v. Neuman, 278 F. Supp. 865, 867 (W. D. La. 1967), it was stated:

Perhaps it would not quite be correct to state what the Deputy Commissioner implied, that the burden is on the defendants to demonstrate that as a practical matter claimant can get a suitable job and is therefore not disabled from earning her living. But as a practical matter such is not far from the true burden defendants should have borne before the Deputy Commissioner. If the claimant had the burden of proof to establish that her employment in a position commensurate with her now lessened abilities was implausible, she would have the burden of proving a negative fact — something the law rarely, if ever, imposes. Should she seek employment for a day to establish the negative fact that she cannot

Meaningful and thoughtful reflection supports the conclusion that the determination of whether work was in fact available to petitioner in the Madison area or its immediate environs and the notification of that fact were the responsibility of the employer.

Nor should any undue reliance be placed on petitioner's supposed lack of motivation in not actively seeking employment, a point alluded to by the compensation judge. We agree with the view expressed in a recent Oregon decision, *Deaton v. State Accident Insurance Fund,* 509 *P.* 2d 1215 (Or. App. 1973) :

> . . . [W]hen it is apparent from a claimant's physical condition, plus all the other relevant factors, that he is unable to work at any suitable and gainful employment, motivation is immaterial, because it appears unlikely that even with the best of motivation could he obtain and retain such employment. (509 *P.* 2d at 1218).

To impose a contrary burden on petitioner would be to render useless the salient features of the "odd-lot" doctrine.

Rodriguez had lost an arm, Lightner had lost three fingers and phalanx of the thumb, and petitioner in *Polulich v. J. G. Schmidt Tool Die & Stamping Co.,* 46 *N. J. Super.* 135 (Cty. Ct. 1957), had lost four fingers. *Id.* at 150. Disabilities of these petitioners were apparent. But as stated in *Kalson, supra,* and recently re-affirmed in *Zanchi,* a person having suffered a myocardial infarction is equally scarred even though his wounds are internal ones. A petitioner of the latter category has as scanty a chance of passing a pre-employment physical as does the former. The employer takes the employee as he finds him, *Belth v. Anthony Ferrante & Son, Inc.,* 47 *N. J.* 38 (1966), with all of the latter's un-

---

find it? Two days? A week? A month? Clearly, the only meaningful way to position the parties in such a situation would be to require the party of interest to prove the positive fact — to require her employer to prove she could be employed. This her employer failed to do.
See also *Brown v. Safeway Stores, Inc.,* 82 *N. M.* 424, 438 *P.* 2d 305 (App. 1970).

derlying conditions and quiescent diseases revealed in a thorough medical examination. Interestingly enough, it is more of an uncertainty for an employer to hire a 60-year-old applicant with an underlying heart condition than to hire a one-armed industrious man of 43 with a family to support, and whose motivation cannot be found wanting. The former's condition may well re-appear at any time; the latter may have some difficulty at first, but should, in due time, adjust and not be prone to recurring attacks nor fear strenuous work. Hence to discount the heart attack victim as a source of anxiety to himself as a working unit and to his employer, is to ignore the realities and acumen of the hiring businessman. We are not so naive.

That petitioners in *Rodriguez* and *Polulich* spoke little English is not enough of a factor to distinguish those cases from the instant one. To suppose that the language barrier was the significant element by which those petitioners failed to receive employment and which led to their post-accident psychoneurological traumas is to misstate the obvious. Neither of those claimants, nor petitioner herein, completed even an elementary school education. It was suggested at the compensation hearing in the instant case that petitioner was physically capable of desk or other light work: elevator operator, guard or some such work. We have seen the consequences befalling the other petitioners upon their non-obtaining of any jobs: *e. g.*, where Rodriguez made over 40 applications and Polulich 100. Since it is very rational and likely that human beings act accordingly when they are rejected and shunted, how can we suppose that petitioner here will not undergo the same experience? Certainly, with his education and present condition, he is unqualified for any of the jobs suggested at the compensation hearing. Are we to wait until such time as Barbato too undergoes a behavorial neurosis before we find the petitioner deserving of a disability award? Our scope of judicial review takes into account the plethora of cases and real life factual situations that have passed before this Court over the years. Their value speaks

in terms of their functional import. One such lesson that we, as Judges and observers of human nature, can comprehend is not to await a calamity before finding and applying suitable and precautionary remedies. Our sense of social justice demands that we do not wait until further damage has been done.

In conclusion, a person fitting the description of petitioner herein who has no reasonable prospects of selling his services and who has no material earning capacity becomes substantially helpless as a self-sustaining unit of society. Our remedial and beneficent workmen's compensation laws were expressly designed to obviate society of the charge and welfare of such a person. In this light, we reverse and remand to the compensation division to enter an award in accordance with this opinion.

Justice JACOBS and Judge COLLESTER join in this opinion.

CONFORD, P. J. A. D., Temporarily Assigned (concurring). I concur fully in Point I of the Court's opinion and in the conclusion of compensability arrived at in Point II.

The principle of compensability under the odd-lot doctrine was firmly embraced by this Court in *Zanchi v. S & K Const. Co.,* 63 *N. J.* 331 (1973), adopting the findings and conclusions in the well-reasoned opinion of Judge Wood for the Union County Court, reported in 124 *N. J. Super.* 405 (1971). The Appellate Division had long theretofore held the same view. *Rodriquez v. Michael A. Scatuorchio, Inc.,* 42 *N. J. Super.* 341 (App. Div. 1956), certif. den. 23 *N. J.* 140 (1957) ; *Lightner v. Cohn,* 76 *N. J. Super.* 461 (App. Div. 1962), certif. den. 38 *N. J.* 611 (1962) ; and see *Quiles v. N. J. Metals Co.,* 37 *N. J.* 91, 101 (1962) ; 2 *Larson, Workmen's Compensation* (1970) § 57.51, p. 82 *et seq.*

Thus, the issue here is not the present viability of the odd-lot doctrine but the justification for its rejection as inapplicable in this case by the Judge in Compensation and the county court, and for the determination by the Appellate Division that the finding by those tribunals that petitioner

"is not really unemployable" was supported by substantial credible evidence in the record.

A review of the reasons for disallowance by the tribunals below of petitioner's claim of total disability under the odd-lot doctrine suggests that he was barred on two broad grounds. (1) Petitioner's physical condition and attendant personal circumstances did not equate with a conclusion of unemployability; stress was laid on his not seeking employment; (2) If he was unemployable this was primarily attributable to his age, and in such case compensation does not attach as the act was not "intended to be a pension or retirement plan for older but no longer employed workers" (compensation decision). Both conclusions are also undergirded by the compensation judge's impression that petitioner did not "inspire a feeling of total candor". As to the last factor, in the absence of specific findings as to material operative facts, a generalized trial impression as to credibility of a witness is of slight use to an appellate court. See *Congleton v. Pura-Tex Stone Corp.*, 53 *N. J. Super.* 282, 286–287 (App. Div. 1958).

On the issue of unemployability in a "reasonably stable [job] market" for such a person as petitioner, see *Larson, op. cit.*, § 57.51, *p.* 82, we have a 60 year old victim of two coronary attacks, the last one, work-connected, of moderate severity, with a worse-than-average recovery, according to the treating physician. He had not completed the sixth grade and had difficulty reading. His intelligence is "low normal". His work experience in the past has always involved heavy manual labor. He had no training in any trade. The treating physician had proscribed heavy labor but said petitioner could do "desk work".

Direct evidence of petitioner's capacity to find and do work suitable to his condition and abilities on a continuous basis was not presented because petitioner had not tried to find work nor respondent to prove there was work available for such a person. But there was indirect evidence in the testimony of the petitioner's expert that there was no work

for one like him in the existing job market; and also in the proof that after petitioner had his first heart attack seven years previously he tried but could not find no light work, but only heavy labor, which at that time he was able to manage. The settled pertinent rule is that if the petitioner *prima facie* fits the odd-lot category the burden of proof on the issue of availability of work for such a person passes to the employer. *Zanchi v. S & K Const. Co., supra* (124 *N. J. Super.* at 411); *Lightner v. Cohn, supra* (76 *N. J. Super.* at 468).

True, petitioner here owned a home, had $200 a month in social security benefits and adult children contributing to the home support. He thus had less motivation to seek work than others less fortunate. This seemed to weigh heavily in the judgment of the compensation judge. However, these facts are irrelevant if, in a case calling for it, the employer has not offered proof that work is available for the workman. The criteria for the odd-lot doctrine are objective, not subjective. See *Deaton v. State Accident Insurance Fund,* 509 *P.* 2d 1215, 1218 (Or. App. 1973).

Petitioner's situation clearly met the criteria for *prima facie* application of the odd-lot doctrine. His case is hardly distinguishable factually from that of the petitioner in *Zanchi, supra,* where we held the doctrine controlling under the facts (In fairness to the tribunals below, *Zanchi* was decided after the Appellate Division decision herein). Each case involves a laborer of about 60 with a substantial cardiac disability and limited education and skills. *Zanchi* was held an odd-lot case, and a denial of 100% disability was reversed notwithstanding petitioner had not made affirmative efforts to secure employment, the employer not having undertaken to show employment was available for him. The *Zanchi* precedent calls for the same conclusion here, as do the general views held elsewhere on the subject of burden of proof in this area. See *Larson, op. cit.,* § 57.61, *p.* 88.13 *et seq.; Army and Air Force Exchange Service v. Neuman,* 278 *F.*

*Supp.* 865, 867 (W. D. La. 1967) ; *Brown v. Safeway Stores, Inc.,* 82 *N. M.* 424, 483 *P.* 2d 305 (App. 1970).

There is no tenable basis for the views of the compensation and county courts that because petitioner's age is the primary cause of his unemployability, the compensation act is not a vehicle for his relief. One may pass the question whether age was a more significant contributor to petitioner's assumed unemployability than his employment-connected heart condition. It may be noted that were it not for the latter, he would presumably still be working at heavy labor. But of controlling importance is the principle that the employer takes the employee as he finds him, *Bellh v. Anthony Ferrante & Son, Inc.,* 47 *N. J.* 38 (1966), and here he took him at his then age. If the work-connected injury, operating on the whole person, produces total disability (meaning, in the odd-lot area, unemployability) the employer is responsible for the whole result, *Ibid.,* notwithstanding that also contributory to the end result are the petitioner's other disadvantages, including age. The cases are legion in which the odd-lot doctrine was applied notwithstanding age was a significant factor in the picture of unemployability. For present purposes it suffices to cite *Zanchi* and *Lightner v. Cohn,* both *supra,* both involving men in their 60's.

The determinations of the lower tribunals denying total disability in this case being insupportable on this record either in law or fact, they are properly reversed by the court.

Justice HALL joins in this opinion.

SULLIVAN, J. (dissenting). I would affirm the judgment of the Appellate Division on the ground that there is substantial credible evidence present in the record to support the finding of the County Court that, on the facts, the "odd-lot" doctrine did not apply to petitioner.

Justice CLIFFORD joins in this dissent.

HALL, J., and CONFORD, Judge, concur in result.

*For reversal and remandment* — Acting Chief Justice JACOBS, Justices HALL and PASHMAN and Judges CONFORD and COLLESTER—5.

*For affirmance*—Justices SULLIVAN and CLIFFORD—2.